UNITED STATES, Appellee

v.

Darrell L. SHELTON, Sergeant
U.S. Army, Appellant

No. 03-0694

Crim. App. No. 9900816

United States Court of Appeals for the Armed Forces

Argued October 5, 2004

Decided September 27, 2005

PER CURIAM.  BAKER, J., filed a dissenting opinion in which
CRAWFORD, J., joined.

Counsel


For Appellant:  Captain Rob W. MacDonald (argued); Lieutenant
Colonel Mark Tellitocci and Major Allyson G. Lambert (on brief);
Colonel Robert D. Teetsel and Captain Craig A. Harbaugh.


For Appellee:  Captain Magdalena A. Przytulska (argued); Colonel
Steven T. Salata, Lieutenant Colonel Theresa A. Gallagher, and
Lieutenant Colonel Mark L. Johnson (on brief); Lieutenant
Colonel Margaret B. Baines.

Amicus Curiae for Appellant:  Michael D. Hulser (law
student)(argued); Charles S. Temple, Director, Criminal Practice
Clinic (on brief) – for Franklin Pierce Law Center

Military Judges:  Richard J. Hough and Patrick J. Parrish


THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.

PER CURIAM:

At a general court-martial composed of officer members, Appellant was convicted, contrary to his pleas, of conspiracy to commit unpremeditated murder, unpremeditated murder, larceny, and kidnapping, in violation of Articles 81, 118(2), 121, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 881, 918(2), 921, and 934, respectively. The adjudged and approved sentence included a dishonorable discharge, confinement for life, total forfeiture of pay and allowances, and reduction to the lowest enlisted grade. The United States Army Court of Criminal Appeals affirmed in an unpublished opinion.

On Appellant's petition, we granted review of one assigned issue[1] and one specified issue.[2] For the reasons set forth below, we affirm the findings of unpremeditated murder, larceny, and kidnapping, modify the findings on the conspiracy charge, and affirm the sentence.[3]

---

[1] WHETHER APPELLANT'S FIFTH AMENDMENT RIGHT TO DUE PROCESS AND SIXTH AMENDMENT RIGHT TO COMPULSORY PROCESS WERE VIOLATED WHEN THE MILITARY JUDGE REFUSED TO ORDER PRODUCTION OF WITNESSES WHO WERE NECESSARY AND MATERIAL TO THE DEFENSE.

[2] WHETHER THE SPECIFICATION UNDER CHARGE I OF WHICH APPELLANT WAS CONVICTED, CONSPIRACY TO COMMIT UNPREMEDITATED MURDER, STATES AN OFFENSE UNDER THE UCMJ.

[3] We heard oral argument in this case at the Franklin Pierce Law Center, Concord, New Hampshire, as part of the Court's "Project

## I.  BACKGROUND

Appellant was convicted of murdering Private First Class (PFC) Chafin in August 1997.  In a separate trial, Appellant's co-actor, Sergeant Seay, was convicted of premeditated murder and other offenses related to the death of Chafin.  See United States v. Seay, 60 M.J. 73 (C.A.A.F. 2004).  In the present trial, the prosecution introduced evidence of the following events.

Chafin's roommate, Specialist Henry, testified that Appellant, Seay, and Chafin attended a party in the barracks along with several other soldiers.  During the evening, there was a shoving match between Chafin and Appellant's roommate, Specialist Johnson.  After the other soldiers separated Chafin and Johnson, Henry escorted Chafin to their room.  Henry, who thought Chafin was too drunk to go out that evening, advised him to stay in, and then left Chafin alone in the room.

According to Seay, Appellant subsequently brought Chafin to Seay's vehicle.  Appellant and Chafin began to argue in the car.  Seay's wife testified that after the three men arrived at Seay's apartment, Chafin passed out on the couch, and she told them to remove Chafin from the apartment.

---

Outreach."  See United States v. Mahoney, 58 M.J. 346, 347 n.1 (C.A.A.F. 2003).

Seay testified that he went to his vehicle, and at Appellant's direction, sat in the back. Appellant placed Chafin, who was still drunk, in the front passenger seat and drove away from the apartment. According to Seay, Appellant "had some string on him and wanted me to choke [Chafin] 'till he passed out . . . .'" After initially declining to do so, Seay began to choke Chafin, which awoke him. When Appellant drove to the side of the road, Chafin left the vehicle and attempted to escape. Appellant intercepted Chafin, pinned him to the ground, gave Seay a knife, and told him to stab Chafin in the neck. Seay complied, stabbing Chafin in the neck and ribs. He then passed the knife to Appellant, who repeatedly stabbed Chafin in the ribs. Appellant then dumped Chafin's body down a ravine. A week later, Appellant learned Chafin had been carrying a substantial amount of money with him on the night of the murder. He returned to the ravine with Seay and removed Chafin's wallet, keys, and a belt.

Chafin's corpse was not discovered for four months, and the investigation continued for two years. During the initial stages, the investigators scrutinized the activities that evening of a number of individuals, including Appellant, Seay, and Johnson. Seay's wife, at his request, initially misled the investigators as to Chafin's whereabouts on the night of his disappearance, but she later advised them of her suspicion that

her husband was involved in the murder.  Two years after the incident, Seay confessed, providing a detailed description of his participation with Appellant in the murder of Chafin.  Seay was tried by general court-martial, convicted of murder, and sentenced to confinement for life without parole, a dishonorable discharge, total forfeiture of pay and allowances, and reduction to the lowest enlisted grade.  The convening authority then provided a grant of testimonial immunity and ordered him to testify at Appellant's court-martial.

## II. PRODUCTION OF WITNESSES

### A.  THE DEFENSE MOTION

One element of the defense strategy at trial involved an attempt to persuade the panel that Johnson, not Appellant, was Seay's partner in crime.  Although the defense had no plausible explanation for the fact that Seay provided a detailed description of Appellant as the perpetrator, and not Johnson, the defense sought to raise a doubt as to Appellant's role by demonstrating that Johnson had motive and opportunity to murder Chafin.

At the request of the defense, the military judge ordered the production of Johnson as a witness.  Anticipating that Johnson would present self-exculpatory testimony, the defense also sought production of three other witnesses -- Ms. Werth,

Ms. Dominico, and Ms. King -- both to offer substantive evidence of Johnson's motive and opportunity to murder Chafin and for the purpose of impeaching his expected testimony. The military judge denied the request to produce these three witnesses. The defense challenges that ruling in the present appeal.

The defense subsequently decided not to call Johnson as a witness. Appellant asserts that the military judge forced the defense to forgo calling Johnson because of the erroneous refusal to order production of the three witnesses. According to the defense, these witnesses would have demonstrated that Johnson had a motive to commit the murder, that he had provided investigators with a false alibi for the evening of the crime, and that he had exhibited consciousness of guilt. Appellant contends that the military judge's ruling was contrary to his Sixth Amendment right to compulsory process for obtaining witnesses and his Fifth Amendment right to present the testimony of such witnesses in his own defense.

## B. ASSESSMENT OF PREJUDICE

For purposes of this appeal, we shall assume, without deciding, that the three requested witnesses possessed information that was "relevant and necessary" under Rule for Courts-Martial (R.C.M.) 703(b)(1), and that Appellant was entitled to their production. See United States v. Breeding, 44

M.J. 345, 350 (C.A.A.F. 1996). In that context, the issue is whether any error in denying the production of these witnesses was harmless beyond a reasonable doubt. United States v. Powell, 49 M.J. 220, 225 (C.A.A.F. 1998).

The defense proffer that accompanied the motion indicated that Ms. King would dispute Johnson's initial statement to investigators that he was at Ms. King's residence on the night of Chafin's disappearance, contrary to an alibi initially provided by Johnson to investigators. Ms. King, however, could not be located by either party. She did not testify at the investigation pursuant to Article 32, UCMJ, 10 U.S.C. § 832 (2000). Defense counsel had never spoken to her, and the Government could not locate her at the address provided by the defense. The defense has not demonstrated that the Government was negligent or otherwise deficient in its attempt to locate her.

Defense counsel proffered that Ms. Werth would testify that Johnson called her from Kuwait, and during the conversation, he inquired about the investigation into Chafin's disappearance. The proffer also indicated that she would testify that Johnson was rude when Chafin's father came to the installation to inquire about his son. According to the defense, both of these incidents would reflect Johnson's guilty state of mind.

7

The defense also proffered that Ms. Werth would testify that Johnson told her that his wallet had been stolen. The defense would have tied this to testimony from Mrs. Seay that the wallet of a guest had been stolen, which the defense would have used to show that Johnson, not Appellant, was in the Seay apartment on the night of the murder. Finally, the defense proffered that Ms. Werth would testify that Chafin had told her that Johnson had once lied to her when Johnson said that he had gone to Texas to settle a score, when he had not done so. According to the defense, this would have shown that because Chafin caught Johnson in a lie and told Werth about it, the embarrassment would have provided Johnson with a motive to kill him.

Defense counsel proffered that Ms. Dominico would testify that several weeks after Chafin's disappearance, Johnson said to her "Personally, I think he's dead." According to defense counsel, this comment reflected a guilty state of mind.

Assuming that these statements met the modest threshold required for production of witnesses under R.C.M. 703, we conclude that any error in non-production of these two witnesses was harmless beyond a reasonable doubt. The Government's case against Appellant was very strong. Seay testified in graphic detail how he and Appellant killed Chafin. His testimony was corroborated by physical evidence and Mrs. Seay's testimony,

8

particularly her description of Chafin's arrival with Appellant and Seay at the Seay residence on the night of the murder. The defense was unable to provide the panel with any reasonable explanation as to why Seay would substitute Appellant for Johnson as his co-actor. With respect to Mrs. Seay, the defense sought to portray her as confusing Appellant with Johnson, but she confirmed that she knew both men, and that it was Appellant, not Johnson, who was in her apartment on the evening in question.

The entirety of the record establishes that the denial of the three witnesses at issue was harmless beyond a reasonable doubt. See United States v. Hall, 58 M.J. 90, 94-95 (C.A.A.F. 2003).

### III. CONSPIRACY TO COMMIT UNPREMEDITATED MURDER

#### A. INSTRUCTIONS

The military judge instructed the panel regarding the elements of both premeditated murder and conspiracy to commit premeditated murder. In accordance with defense counsel's request, the military judge also included instructions regarding the lesser included offenses of unpremeditated murder and conspiracy to commit unpremeditated murder.

Regarding unpremeditated murder, the military judge instructed, in part, that the members would have to find "that

at the time of the killing, the accused had the intent to kill or inflict great bodily harm on PFC Chafin." With respect to conspiracy to commit unpremeditated murder, the military judge included in the instructions the requirement that the members would have to find that the accused "entered into an agreement with Sergeant Bobby D. Seay II to commit unpremeditated murder," and that the elements of the object of the conspiracy were "the same as set forth in the instruction on the lesser included offense of unpremeditated murder." After deliberations, the panel returned findings of not guilty of the premeditated offenses, but guilty of both lesser included offenses.

B. PREMEDITATED MURDER, UNPREMEDITATED MURDER, AND CONSPIRACY

Article 118, UCMJ, includes two offenses pertinent to the present case: (1) premeditated murder (an unlawful killing by a person who "has a premeditated design to kill"); and (2) unpremeditated murder (an unlawful killing by a person who "intends to kill or inflict great bodily harm"). Article 81, UCMJ, in pertinent part, makes it an offense to "conspire[] with another person to commit an offense" under the UCMJ.

Appellant contends that the act of conspiring to commit murder transforms an unpremeditated murder into a premeditated murder, and that a finding of not guilty to premeditated murder

10

negates the existence of an agreement to commit murder.[4]

Appellant argues that if the parties to the conspiracy agreed only to commit great bodily harm to Chafin, then the offense would amount only to conspiracy to commit an aggravated assault. Under the defense theory, the fact that a death eventually resulted from a conspiracy to commit aggravated assault might be relevant to whether a person could be charged with unpremeditated murder, but that would not transform an agreement to commit great bodily harm into an agreement to commit murder.

The Government counters that conspiracy to commit unpremeditated murder is a valid offense under the UCMJ. Specifically, the Government focuses on the "intent to inflict great bodily harm" as an available state of mind under Article 118(2), the offense of unpremeditated murder. The Government argues that the panel reasonably could have determined that Appellant entered into an agreement with Seay to inflict great bodily harm on Chafin. In the Government's view, such an intent would satisfy the intent element for the conspiracy offense without a further need to determine whether Appellant intended an unpremeditated killing.

_____

[4] In support of this position, Appellant cites Mitchell v. State, 767 A.2d 847, 854-55 (Md. 2001); People v. Cortez, 960 P.2d 537, 538 (Cal. 1998); and People v. Hammond, 466 N.W.2d 335, 337. (Mich. Ct. App. 1991).

11

United States v. Shelton, No. 03-0694/AR

In the present case, the military judge's instructions included alternative theories upon which the members could rely to find Appellant guilty of unpremeditated murder, both as a substantive crime and as the underlying offense of the conspiracy. The members returned a general verdict of guilty of both of these lesser included offenses. Because the members do not provide an explanation when announcing their findings, the record does not demonstrate whether the members found an "intent to kill" or an "intent to inflict great bodily harm" as the determinative state of mind. Under these circumstances, we cannot affirm the finding of conspiracy to commit unpremeditated murder unless Appellant would be liable under both theories. See Griffin v. United States, 502 U.S. 46, 51-56 (1991); Yates v. United States, 354 U.S. 298, 312 (1957), overruled on other grounds, Burks v. United States, 437 U.S. 1, 18 (1978).

Appellant's conviction for conspiracy to commit unpremeditated murder cannot be affirmed on appeal because the instructions authorized the members to base the conviction on a finding of an intent to "inflict great bodily harm." If the intent of the parties to the agreement was limited to the infliction of great bodily harm, their agreement was to commit aggravated assault, not unpremeditated murder. See Article 128(b), UCMJ, 10 U.S.C. § 928(b) (2000); 2 Wayne R. LaFave, Substantive Criminal Law § 12.2(c)(2), at 278-79 (2d ed. 2003);

12

State v. Donohue, 834 A.2d 253, 256 (N.H. 2003). In view of our disposition of this issue, we need not address Appellant's contention that conspiracy to commit unpremeditated murder may not be predicated upon an "intent to kill" state of mind after the members have rejected the premeditation element of the charged conspiracy to commit premeditated murder.

Under the circumstances of this case, we can affirm a finding of guilty to the lesser included offense of conspiracy to commit aggravated assault. In view of that finding and the other findings we affirm in this decision, we conclude that any error in the conspiracy finding was not prejudicial as to the sentence.


IV. DECISION

The decision of the United States Army Court of Criminal Appeals is affirmed, except for the finding of conspiracy to commit unpremeditated murder. As to that offense, a finding of the lesser included offense of conspiracy to commit aggravated assault, in violation of Article 128, UCMJ, is affirmed.

United States v. Shelton, No. 03-0694/AR

BAKER, Judge, with whom CRAWFORD, Judge, joins (dissenting):

I agree with the majority's result on Issue I, but respectfully disagree with the analysis. I would not "assume without deciding" that the witnesses at issue were relevant and necessary. In my view, the defense did not carry its burden to demonstrate relevance and necessity. Therefore, the military judge did not err in refusing to order their production and we should not shy away from saying so.

I respectfully dissent with respect to Issue II because I believe the unusual text and legislative history to Article 118(2), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 918(2) (2000), support the conclusion that conspiracy to commit unpremeditated murder is an offense under the UCMJ. Therefore, the military judge did not err, based on the facts of this case, in giving the instruction the defense requested. The majority reaches an opposite conclusion without reference to either the text or legislative history to Article 118(2). In the end, the question presented is academic in nature because the majority provides Appellant no relief and the factual and legal circumstances of this case, we might hope, are not likely to repeat themselves.

<u>APPELLANT'S TRIAL</u>

At Appellant's court-martial, defense counsel requested production of Specialist Johnson in support of the theory that Johnson, rather than Appellant, was involved in Chafin's murder. Defense counsel also sought production of three other witnesses, Ms. Werth, Ms. Dominico, and Ms. King. Through these witnesses the defense intended to impeach Johnson's statements to investigators and demonstrate that he had a greater motive and opportunity to murder Chafin than Appellant. According to defense counsel, Ms. Werth would have testified that Johnson was rude to Chafin's father after Chafin's disappearance and that Johnson later called her from Kuwait inquiring about the investigation into Chafin's death. Ms. Dominico would have testified to a statement by Johnson following Chafin's disappearance that, "[p]ersonally, I think he's dead." Ms. King would have contested Johnson's statement to the Criminal Investigation Division (CID) that he was at her apartment the night of the murder. Finally, all three witnesses would have testified that at some point before Chafin's death, Chafin revealed that Johnson had lied to the women about a trip, unrelated to the murder, that Johnson claimed to have taken to avenge a friend's death.

The military judge granted the defense motion to produce Johnson, but denied production of the three proffered witnesses in the following ruling:

> In regards to Miss Dominico, her proffered testimony does not show any guilty state of mind or guilty knowledge by Specialist Johnson. Her proffered testimony is not relevant. The motion to produce Miss Dominico as a witness is denied.
>
> With regards to Miss Werth, her proffered testimony does not show any guilty state of mind or guilty knowledge by Specialist Johnson. Her proffered testimony is not relevant. The motion to produce Miss Werth is denied.
>
> With regards to Miss King, defense has not talked to her, and defense has not produced -- or excuse me -- has not provided an address, location, or phone number as to how to contact her, and the government's not required to search for defense witnesses. Now, for that proposition, I cite you to Gans at 23 MJ 540. And, besides, her proffered testimony is not relevant. The motion to produce her as a witness is denied.

Although the request for Johnson was granted, the defense declined to call him during its case on the merits. According to Appellant's post-trial submission pursuant to Rule for Courts-Martial (R.C.M.) 1105, his reason for not calling Johnson was that he had been "deprived of any ability to impeach" Johnson's expected testimony.

In his instructions to the members, the military judge charged the panel regarding the elements of both premeditated murder and conspiracy to commit premeditated murder. In accordance with defense counsel's request, the military judge also included instructions regarding the lesser included

3

offenses of unpremeditated murder and conspiracy to commit
unpremeditated murder.  The panel returned a finding of not
guilty of the premeditated offenses, but guilty of both lesser
included offenses.

## A.  WITNESS PRODUCTION

Appellant argues that the military judge's denial of his
motion to compel production of witnesses prevented him from
demonstrating that Johnson had a motive to commit the murder,
that he had provided investigators with a false alibi for the
evening of the crime, and that he had exhibited consciousness of
guilt.  According to Appellant, he was effectively deprived of
his capacity to impeach Johnson on the witness stand and develop
the theory that Johnson, rather than Appellant, participated in
Chafin's murder.  Appellant contends that this amounted to a
deprivation of his Sixth Amendment right to compulsory process
for obtaining witnesses and his Fifth Amendment right to present
the testimony of such witnesses in his own defense.  The
appellate question is whether the military judge abused his
discretion in denying production of the requested witnesses.

"An accused has a constitutional right to present relevant
evidence to defend against [criminal] charges."  United States
v. Browning, 54 M.J. 1, 9 (C.A.A.F. 2000).  The right, however,
is not absolute.  Id. (citing United States v. Woolheater, 40
M.J. 170, 173 (C.M.A. 1994)).  Under R.C.M. 703(b)(1), a party

4

United States v. Shelton, No. 03-0694/AR

is entitled to production of witnesses whose testimony "would be relevant and necessary" to a matter in issue. United States v. Breeding, 44 M.J. 345, 350 (C.A.A.F. 1996). "Relevant evidence is necessary when it is not cumulative and when it would contribute to the party's presentation of the case in some positive way on a matter in issue." R.C.M. 703(b)(1) discussion. Relevant evidence is any evidence that tends to prove or disprove any disputed fact that is significant to resolving the action. Military Rule of Evidence (M.R.E.) 401. A military judge's decision to admit or exclude evidence is reviewed for an abuse of discretion. United States v. Tanksley, 54 M.J. 169, 175 (C.A.A.F. 2000), overruled on other grounds, United States v. Inong, 58 M.J. 460, 464 (C.A.A.F. 2003). We will not overturn a military judge's evidentiary decision unless that decision was "arbitrary, fanciful, clearly unreasonable," or "clearly erroneous." United States v. Miller, 46 M.J. 63, 65 (C.A.A.F. 1997)(citations omitted).

Admissibility issues are generally resolved through a motion for appropriate relief. The burden of persuasion on a motion to admit evidence is on the moving party. United States v. Rodriguez, 60 M.J. 239, 246 (C.A.A.F. 2004); Browning, 54 M.J. at 9; R.C.M. 905(c)(2)(A); R.C.M. 906(b)(7). If the military judge excludes evidence, the burden is also on the

5

proponent of the evidence to demonstrate that the military judge abused his discretion.  Browning, 54 M.J. at 9.

1.  Ms. Werth

Defense counsel proffered that Ms. Werth would offer testimony in four areas.  First, she would testify to a phone call Johnson made from Kuwait inquiring about the investigation into Chafin's whereabouts.  Second, she would testify that Johnson was rude to Chafin's father when the father came inquiring about his son.  Third, she would testify that Johnson told her that someone had stolen his wallet.  Lastly, she would testify that Chafin told her that Johnson had lied to her about going to Texas once.  The portion of the colloquy between the military judge and defense counsel regarding the relevance of the telephone call follows:

> MJ:  So, Specialist Johnson called Miss Werth to ask about a friend of his, that friend being PFC Chafin, and you believe that that shows some sort of motive or something on the part of Specialist Johnson.
>
> DC:  A culpable mind, yes, sir.
>
> MJ:  How?
>
> DC:  Because, again -- well, Miss Werth thought it was unusual that he would call her back for that purpose alone from Kuwait. . . .
>
> MJ:  Well, was it unusual for PFC Chafin to be missing for several months?
>
> DC:  Yes, sir.

Emphasis added.  The defense argument was that only a guilty party would make such inquiries from Kuwait.  Thus, according to defense counsel, the call supported the defense theory that Johnson rather than Appellant was involved in the murder.

As for the relevance of the testimony about Johnson and Chafin's father, that colloquy went as follows:

> DC:  Yes, sir, they were friends.  If they were friends, you wouldn't expect that friend to be rude and obnoxious or belligerent . . . when the father comes down trying to find his son.
>
> MJ:  So, what's the relevance?
>
> DC:  <u>Simply that's unusual behavior</u>.  Unusual behavior related to this case and trying to determine -- the whereabouts --
>
> MJ:  What's [sic] it show?
>
> . . . .
>
> DC:  Well, if you take the cumulative evidence and not each individual piece but the cumulative evidence of his behavior in this case, it suggests that he had something to do with this crime. . . .

Emphasis added.

Next, defense counsel asserted that Ms. Werth would testify that Johnson had once boasted that he was going to Texas to settle a score and then disappeared.  She would then testify that Chafin had told her that Johnson had lied and that he was not in Texas at all but was instead in Colorado.  According to counsel, this testimony would show a conflict between Johnson and Chafin and thus a motive to kill.  However, defense counsel

conceded that Ms. Werth never witnessed a dispute or argument between Chafin and Johnson on this matter. Counsel's colloquy with the military judge with respect to this testimony reveals that the witness heard one thing from Johnson and another from Chafin. As a result, according to counsel, Ms. Werth would testify that in her opinion Johnson had lied. The military judge found insufficient foundation for such an opinion.

Finally, with respect to Ms. Werth's expected testimony regarding the stolen wallet, defense counsel prefaced his argument with the assertion that the evidence would show that after Chafin's death a bus ticket with Johnson's name on it was found in Chafin's room. Counsel's argument on this issue proceeded as follows:

> DC: The one thing that Ms. Werth talks about or can talk about is the loss of -- I'm sorry; the theft of Specialist Johnson's wallet, specifically that he had told her that his wallet had been stolen. She said that she observed that he did not have his wallet. If you take that, then, link that up to the bus ticket potentially that was found in PFC Chafin's room after his murder and then you link that to the statements by Mrs. Seay, who claimed that she heard voices the night that PFC Chafin was allegedly at her house, someone made the remark, "Now we know who stole your ATM card," well, the only evidence that's -- the only evidence about the stolen ATM card potentially would be the loss of Johnson's credit cards. He would be the natural person that that comment would be made to in this case.
>
> . . . .
>
> MJ: How does the missing wallet connect up with a bus ticket?

8

DC: Well, the wallet could have been used -- and this is what Johnson provides himself when he tries to provide the explanation when asked by CID, "Why does a bus ticket with your name wind up in PFC Chafin's room?" And his answer is, "Well, my ID card and my dog tags were stolen," and in fact the evidence suggests that it was -- his wallet was stolen, one conclusion possible, conclusion to that, is perhaps PFC Chafin had stolen his wallet.

. . . .

MJ: . . . I'm confused as to how the ATM card links up with Johnson's wallet. Did Johnson say his ATM card was missing? Did Johnson even say he had an ATM card?

DC: No, sir. He said his wallet and his credit cards were missing.

The apparent point of this confusing exchange was to show that Chafin may have used Johnson's stolen ID card to purchase the bus ticket. Since an ID card and an ATM card are things likely to be in a wallet, by logical extension Chafin may have stolen Johnson's wallet. Thus, according to counsel, the statement purportedly overheard by Mrs. Seay could only have been made to Johnson, placing him instead of Appellant at the Seay residence that night.

In my view Appellant failed to demonstrate the relevance of this witness. Ms. Werth's proffered testimony may have been useful to impeach Johnson (had Appellant chosen to put him on the stand), but Appellant failed to demonstrate to the military judge why the proffered testimony made it more or less likely

that Johnson and not Appellant participated in Chafin's murder. And Appellant did not present any alternate evidence implicating Johnson in the crime. For example, Johnson was never connected to the weapon involved. Therefore, based on counsel's insufficient statements on the record in support of the claims of relevance, I would find that the military judge did not abuse his discretion and that Appellant's Fifth or Sixth Amendment rights were not violated with respect to this witness.

2. Ms. Dominico

Counsel proffered that Ms. Dominico would testify to a statement allegedly made by Johnson in reference to Chafin to the effect, "Personally, I think he's dead." Defense counsel argued relevance on the following basis:

> MJ: Okay. Did he say anything besides, "I personally think he's dead[?"] Like, you know, "I know he's dead," "I know where the body is," or "I know who did it," or just "I think he's dead[?"]
>
> DC: Just that he thinks he's dead. He didn't make any overtly incriminating statements, nor would you expect him to make those. But, again, those are <u>unusual comments</u> to make about someone.
>
> MJ: It's [an] unusual comment when someone's been missing for several weeks to say, "I think he's dead[?"]
>
> DC: Yes, sir.

Emphasis added.

Like the military judge, I have difficulty discerning what fact in issue this statement was intended to prove. This

10

evidence falls short in showing relevance for the reasons stated with respect to Ms. Werth's proffered testimony.  Likewise, it is not evident to me that the military judge erred in denying production of this witness.

3.  Ms. King

Defense counsel stated that Ms. King would testify that Johnson was not at her apartment the night of Chafin's disappearance, contrary to an alibi initially provided by Johnson to investigators.  According to the record, the Government was unable to locate this witness with the address on file, she had not testified at the Article 32, UCMJ, investigation, and defense counsel had never spoken to her.  The military judge expressed concern that defense counsel had failed to provide an accurate address to enable the Government to find her notwithstanding counsel's response that his request for investigative assistance had been denied by the convening authority.  The military judge then indicated that without any known address for the witness, the Government was not obligated to try and track her down.

With respect to this witness, the theory of relevance apparently hinged on the fact that Johnson was considered, at one time, a suspect in the case.  But, even if Ms. King's testimony were relevant, it remains unclear to me why the witness was "necessary" within the meaning of R.C.M. 703.

11

R.C.M. 703(f)(2) provides a remedy for unavailable evidence: "[If] such evidence is of such central importance to an issue that it is essential to a fair trial, and if there is no adequate substitute, the military judge shall grant a continuance or other relief . . . ." Emphasis added. Defense counsel did not renew his request for investigative assistance with the military judge, nor did he request a continuance. The assistant defense counsel in this case was present at the Article 32 investigation and cross-examined two investigators who testified that early in their investigation that Johnson had become a key suspect because his alibi had not checked out. And, if the object was to later impeach Johnson's alibi, it is not clear why counsel could not have offered the investigators as adequate substitutes for the unavailable Ms. King.

    B.  CONSPIRACY TO COMMIT UNPREMEDITATED MURDER

    On Issue II, I part with the majority because I disagree that the issue here is instructional error. Based on the text of Article 118(2) and its legislative history, I believe the Congress intended to include an "intent to inflict great bodily harm" as both a possible intent element of Article 118(2) as well as an intent element that also appears under Article 128(b), UCMJ. Although unusual in design, and complicated in implementation -- as this case reflects -- I do not believe the Congress was ultimately precluded from incorporating this

12

language in both Articles 118(2) and 128(b) in an effort to capture different measures of intent in different legal contexts. Therefore, on this point, I would answer the specified question in the affirmative.

As a result, it is also necessary for me to address Appellant's primary argument that it is logically impossible for the members to find that he had the necessary intent to establish a conspiracy to commit murder as specified under Article 118(2), sometimes described in case law as "unpremeditated murder," but at the same time, find Appellant not guilty of premeditated murder. Appellant's argument is viscerally appealing, however, based on the particular text and legislative history of Article 118(2), I believe the intent elements required to commit a violation of Article 118(1), 118(2), and a conspiracy to violate Article 118(2) are different. Therefore, it is unusual, but possible for members to find an accused not guilty of premeditation, but guilty of a conspiracy to violate Article 118(2).

### Discussion

The first two clauses of Article 118 define murder in the following terms:

> Any [servicemember] who, without justification or excuse, unlawfully kills a human being, when he -- (1) has a premeditated design to kill; [or] (2) intends to kill or inflict great bodily harm . . . is guilty of murder.

13

Manual for Courts-Martial, United States (2000 ed.)(MCM), pt. IV, ¶ 43.a.

1. Parties' Positions

Appellant claims that it is legally impossible to form the agreement necessary for a conspiracy to commit any form of murder without also necessarily forming the premeditation required of Article 118(1).  Conspiracy to commit unpremeditated murder, he argues, is therefore a logical non sequitur that does not state a valid offense under the UCMJ.[1]  Further, Appellant argues that if the parties to the conspiracy agreed only to commit great bodily harm to Chafin, then the offense amounts only to conspiracy to commit an aggravated assault.  The fact that a death eventually resulted from the conspiracy to commit aggravated assault may be relevant to whether a person might also be charged with murder, but the result alone does not change the conspiracy into a conspiracy to commit murder.

The Government argues that conspiracy to commit unpremeditated murder is a valid offense under the UCMJ. Specifically, the Government focuses on the phrase "intent to inflict great bodily harm" as an available state of mind element under Article 118(2) (the unpremeditated murder offense).  Thus, the Government argues that the panel could have reasonably determined that Appellant entered into an agreement with Seay to

14

inflict great bodily harm on Chafin.  Such an intent would satisfy the intent element for the conspiracy offense without a further need to determine that Appellant intended an unpremeditated killing, and thus avoid the logical conundrums identified by Appellant.[2]

2. The Jury Instructions and Findings

The military judge instructed the members regarding premeditated murder and the lesser included offense of unpremeditated murder, noting that in order to find the Appellant guilty they would have to find "that at the time of the killing, the accused had the intent to kill or inflict great bodily harm upon PFC Chafin."  Shortly thereafter, and pursuant to Appellant's request, the military judge issued instructions regarding conspiracy to commit murder and the following instruction on the lesser included offense of conspiracy to commit unpremeditated murder:

> In order to find the accused guilty of this lesser offense, you must be convinced by legal and competent evidence beyond reasonable doubt that:  One, on or about 29 August 1997 at or near Colorado Springs, Colorado, the accused entered into an agreement with Sergeant Bobby D. Seay II to commit unpremeditated murder, an offense under the [UCMJ]; and
>
> Two, that while the agreement continued to exist, and while the accused remained a party to the agreement,

---

[1] Appellant cites several state court cases in support of his position.  See, e.g., People v. Cortez, 960 P.2d 537, 542 (Cal. 1998).

[2] "If a party only has an intent to commit great bodily harm, no amount of conspiring, planning, or contemplating can turn the crime into conspiracy to commit first degree murder."  Brief on behalf of Appellee at 24.

> Sergeant Shelton and Sergeant Seay, performed on [sic] or more of the over [sic] acts alleged, that is, Sergeant Seay and Sergeant Shelton drove PFC Jason Chafin to a remote location and Sergeant Seay attempted to strangle PFC Chafin, for the purpose of bringing about the object of the agreement.
>      The elements of the offense of which the accused is charged with conspiracy to commit are the same as set forth in the instruction on the lesser included offense of unpremeditated murder in the specification of Charge III. Would anyone like me to re-read those elements and definitions to you?
>      Apparently not.

The panel returned a finding of guilty to this lesser included offense. Because neither comment nor explanation is required of the members when announcing their findings, it is not clear whether the members found an "intent to kill" and/or an "intent to inflict great bodily harm" as the determinative state of mind for the conspiracy to commit unpremeditated murder.

3. Conflicting Analyses

This Court has not yet construed the UCMJ in regard to Appellant's logic paradigm, but several state and federal courts have addressed it in the context of their own murder and conspiracy statutes. See Mitchell v. State, 767 A.2d 844, 847-55 (Md. 2001)(contrasting the various case law approaches).[3] Several state courts have agreed with Appellant's position. Id. In Cortez, 960 P.2d at 542-46, for example, the California

---

[3] This Court has confronted a somewhat analogous issue regarding the inchoate crime of attempted murder. United States v. Roa, 12 M.J. 210 (C.M.A. 1982). Neither party cited to or relied upon the case. In light of the distinctions between the law of attempt and conspiracy, I do not regard Roa as controlling in the present case.

16

United States v. Shelton, No. 03-0694/AR

Supreme Court applied common law scienter analysis to decide that conspiracy to commit murder must necessarily be conspiracy to commit premeditated murder.  See also People v. Hammond, 466 N.W.2d 335, 336-37 (Mich. Ct. App. 1991).  In contrast, the Fifth and Ninth Circuits have construed the federal civilian murder statute to permit conviction of conspiracy to commit second degree, or unpremeditated murder.  United States v. Croft, 124 F.3d 1109, 1122-23 (9th Cir. 1997); United States v. Chagra, 807 F.2d 398, 400-02 (5th Cir. 1986).

These competing lines of case law, however, are of limited precedential value given the disparity between the statutes construed by those cases and the language of Articles 118 and 81, UCMJ.  At this point it is helpful to turn to the text of the UCMJ and its associated legislative history to determine whether conspiracy to commit an unpremeditated murder is a valid offense.

4.  Statutory Analysis

Under Article 81, a conspiracy is formed when any servicemember "conspires with any other person to commit an offense under [the UCMJ] . . . " and "one or more of the conspirators does an act to effect the object of the conspiracy."  The two elements for the crime of conspiracy under Article 81 are:  (1) that the accused entered into an agreement with one or more persons to commit an offense under the [UCMJ];

17

and (2) that while the agreement continued to exist, and while the accused remained a party to the agreement, the accused or at least one of the co-conspirators performed an overt act for the purpose of bringing about the object of the conspiracy. MCM, pt. IV, ¶ 5.b.

In the present case, I see no issue with respect to the second element. If there were a conspiracy between Seay and Appellant to murder Chafin, I am satisfied that Appellant's driving into a remote area and Seay's attempted choking of Chafin, as specified in the charges against Appellant, were overt acts performed for the purpose of bringing about the object of that conspiracy. The parties have not argued otherwise. Consequently, my analysis focuses on the first element. Specifically, the issue is whether Appellant could enter into an agreement with Seay to murder Chafin in violation of Article 118(2), without necessarily engaging in a degree of premeditation that also violated Article 118(1).

Article 118(1) requires that the accused have a premeditated design to kill. Article 118(2) requires that the accused have the intent to kill or inflict great bodily harm upon a person. The explanation of the premeditation element of Article 118(1) states that "[p]remeditated murder is murder committed after the formation of a specific intent to kill someone and consideration of the act intended." MCM, pt. IV, ¶

18

43.c.(2)(a). By comparison, the explanation in Article 118(2) notes that "[a]n unlawful killing without premeditation is also murder when the accused had either an intent to kill or inflict great bodily harm." MCM, pt. IV, ¶ 43.c.(3)(a). Although not explicitly stated in this explanatory text, Article 118(2) is a specific intent crime, distinguished from the Article 118(1) offense principally by the absence of a premeditated design to kill. See United States v. Gray, 51 M.J. 1, 56 (C.A.A.F. 1999); United States v. Loving, 41 M.J. 213, 279-80 (C.A.A.F. 1994); United States v. Morgan, 37 M.J. 407, 411 (C.M.A. 1993); United States v. Vaughn, 23 C.M.A. 343, 345, 49 C.M.R. 747, 748 (1975). In other words, the true line of separation between murder under Article 118(2) and premeditated murder under Article 118(1) is in an increment of planning and consideration that an accused directs towards his act of killing under Article 118(1).

While this makes the line between Article 118(1) and Article 118(2) an imprecise one, as this case well reflects, it is apparent from the legislative history that the drafters of Article 118 intended to create two distinct crimes where the accused possessed a design to effect death: one preceded by premeditation and one not. When articulating the distinction between what would become Article 118(1) and Article 118(2), one of the UCMJ's principal drafters, Mr. Felix Larkin, explained:

19

> The first is where you have design to kill and it is preceded by premeditation and deliberation, which classically is common law murder in the first degree. Then you have the kind where you have the design to effect death and it is not preceded by premeditation and deliberation, which is usually murder in the second degree.

Uniform Code of Military Justice: Hearings on H.R. 2498 Before a Subcommittee of the House Committee on Armed Services, 81st Cong. 1246 (1949), reprinted in Index and Legislative History, Uniform Code of Military Justice (1950) (not separately paginated) [hereinafter Hearings]. A short time later, Mr. Larkin responded to a question regarding the relationship between a design to effect death and an intent to kill, stating "[y]ou may have a design to effect death which is preceded by premeditation and deliberation, or not. It might be on the spur of the moment, a conscious, specific design to effect the death without previous premeditation." Id. at 1247. A member of the subcommittee then summarized: "What do you think about this Mr. Larkin: Murder in the first degree is the killing of a human being with pre-meditation, deliberation, and malice; murder in the second degree is the killing of a human being with malice but without premeditation and deliberation . . . ." Id. As this text again makes clear, the distinction between Article 118(1) and Article 118(2) hinges on premeditation (and deliberation). Thus, it is possible to have a prior design to effect death that is not accompanied by the consideration

required of premeditated murder.  Indeed, this is the essence of

Article 118(2) -- "intent to kill" murder.

Returning to Appellant's argument, he contends that

premeditation is a necessary feature of a conspiratorial

agreement:  that it would be impossible for Appellant to agree

with Seay to kill Chafin without necessarily premeditating that

act.  While this argument has some rhetorical appeal, the MCM's

explanation of the conspiratorial "agreement" in Article 81

states that the agreement:

> need not be in any particular form or manifested in any
> formal words.  It is sufficient if the minds of the parties
> arrive at a common understanding to accomplish the object
> of the conspiracy . . . .  The agreement need not state the
> means by which the conspiracy is to be accomplished or what
> part each conspirator is to play.

MCM, pt. IV, ¶ 5.c.(2).  I do not find in either this text or

the common law of conspiracy a requirement for an increment of

consideration and planning amounting to premeditated design,

although a factfinder could find such an agreement indicative of

premeditated design.  See, e.g., United States v. Jackson, 20

M.J. 68, 69-70 (C.M.A. 1985) (finding conspiratorial agreement

to commit larceny where the accused spontaneously assisted

another in stealing a television).[4]

---

[4] Similarly, I disagree with the assertion that a murder conspirator must have taken "deliberate steps" to bring about the killing.  All that conspiracy requires is the agreement to commit a criminal offense and an overt act committed for the purpose of bringing about the object of the conspiracy. The overt act need not be "a deliberate step."  It may well be an impulsive

While members may find that evidence demonstrating an agreement to murder also leads to a conclusion that there was premeditation of the intended act, such an identical finding is not legally or logically compelled.  Thus, I conclude that, contrary to Appellant's contentions, it is legally possible for a perpetrator to lack the premeditated design to kill and nonetheless have the specific intent to enter into a conspiracy to commit unpremeditated murder in violation of Article 118(2).[5] Accord United States v. Chagra, 807 F.2d 398, 401 (5th Cir. 1986)("[T]he quick answer to defendant's argument is that without proving premeditation the government can prove intent to kill with malice aforethought.  Under the government's theory it was entitled to prove that at the moment of conspiratorial agreement, [the defendant's] intent to kill . . . was impulsive and with malice aforethought."); United States v. Croft, 124 F.3d 1109, 1122-23 (9th Cir. 1997)("[I]t is logically possible to conspire to commit second degree murder.").[6]

---

action, like Seay choking Chafin with a length of string that Appellant kept in his truck.

[5] In United States v. Kinder, 14 C.M.R. 742, 778 (A.F.B.R. 1954), an Air Force Board of Review wrote, "[t]he essential element of conspiracy 'of agreement' between parties to commit an offense naturally reflects premeditation where the object of the conspiracy is murder.  In a charge of conspiracy to commit murder the element of 'premeditation' is a feature of the 'agreement' and not an object of the 'agreement.'"  The board provided no citation or further analysis for this conclusory statement.  My analysis in the present case reaches a contrary conclusion for the reasons stated.

[6] Even if one were to agree with Appellant's argument, verdict inconsistency is ordinarily not sufficient grounds for reversal.  E.g., United States v. Powell, 469 U.S. 57, 66-69 (1984); Dunn v. United States, 284 U.S. 390, 393

5. Alternative Intents

Turning to Appellant's next argument, the alternative intent formulation of Article 118(2)("intent to kill or inflict great bodily harm") raises the possibility that the members may have found an agreement between Seay and Appellant only to inflict great bodily harm on Chafin.  Appellant asserts that an agreement to inflict great bodily harm, without an explicit agreement to kill, will not support Appellant's conviction for conspiracy to commit unpremeditated murder, but only conspiracy to commit an aggravated assault.

In Yates v. United States, the Supreme Court stated that a verdict must be "set aside in cases where the verdict is supportable on one [legal] ground, but not on another, and it is impossible to tell which ground the jury selected."  317 U.S.

---

(1932).  In Dunn, for example, the Supreme Court affirmed the accused's conviction for maintaining a nuisance by selling liquor despite the fact that the jury had acquitted the accused of the underlying charges of possessing and selling liquor.  Writing for the Court, Justice Holmes stated:

> The most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt.  We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity.

284 U.S. at 393.  Similarly, in the present case, even if one were to determine that the panel's conclusion regarding Appellant's state of mind was logically inconsistent with a finding of guilty of conspiracy to commit unpremeditated murder, there would be insufficient basis to reverse the panel's substantive findings of Appellant's guilt.  Cf. United States v. Lyon, 15 C.M.A. 307, 313, 35 C.M.R. 279, 285 (1965)(noting that an inconsistent verdict is not usually a cause for relief because the court-martial may merely have given the accused "a break," but reversing the appellant's conviction on other grounds).

298, 312 (1957), overruled on other grounds by Burks v. United States, 437 U.S. 1, 18 (1978); see also Roa, 12 M.J. at 212-13 (reversing an attempted murder conviction where the factfinder possibly relied on a legally flawed theory of intent).  This principle was distinguished by the Court in Griffin v. United States, 502 U.S. 46, 51-56 (1991).  Griffin ultimately recognized, however, that the Yates principle continues to be good law:  where one of the possible bases of a general verdict is legally inadequate (as opposed to factually inadequate), that verdict must be reversed.  Id. at 55-60.  Because the present panel's finding was general in nature, and did not specify which of the two states of mind in Article 118(2) Appellant's conviction was predicated upon, it must be clear that Appellant could be liable for a conspiracy to violate Article 118(2) whether he had an unpremeditated "intent to kill" or an "intent to inflict great bodily harm."[7]

The drafters of Article 118(2) clearly intended that either an "intent to kill" or an "intent to inflict great bodily harm" would suffice to establish the state of mind required by Article 118(2).[8]  The current manifestation of Article 118 succeeded Article of War 92, reprinted in MCM, U.S. Army (1928 ed.) at

---

[7] If I were to reject the Yates principle, I would sustain Appellant's conviction on the basis of the foregoing "intent to kill" analysis alone.

[8] See discussion of drafters' intent supra.

24

223.  United States v. Valdez, 40 M.J. 491, 495 (C.M.A. 1994).

The 1928 MCM defined murder in Article of War 92 as "the unlawful killing of a human being with malice aforethought."[9] While the drafters of the modern Article 118 dropped the textual reference to malice aforethought, opting instead for the intent terminology of the Model Penal Code, I am persuaded by reference to the legislative history that they intended continuity with common law understandings of the murder offense.  The drafters' commentary to Article 118(2) notes that "intent to inflict great bodily harm has been held to satisfy the 'malice aforethought' requirement."  Hearings at 1231.  Moreover, the Manual discussion states that, "It may be inferred that a person intends the natural and probable consequences of an act purposely done."  MCM, pt. IV, ¶ 43.c.(3)(a).

I see no reason why a hypothetical accused could not enter into an agreement to inflict great bodily harm against a victim in a manner which naturally and probably will result in the victim's death.  Such a hypothetical conspiracy could be formed

---

[9]At common law, all murder was distinguished by malice aforethought:

> The malice which distinguishes the crime of murder must be malice aforethought . . . The legal meaning of malice aforethought, in cases of homicide, is not confined to homicide committed in cold blood with settled design and premeditation, but extends to all cases of homicide, however sudden the occasion, where the act is done with such cruel circumstances as are ordinary symptoms of a wicked, depraved, and malignant spirit.

1 Oscar Leroy Warren & Basil Michael Bilas, Warren on Homicide § 66 at 273-74 (perm. ed. 1938).

without the necessity of forming an express intent to kill. Whether such a hypothetical "intent to inflict great bodily harm" conspiracy would ultimately support a conviction for conspiracy to commit unpremeditated murder, or only an aggravated assault conspiracy may ultimately present a question of fact for a finder of fact.

In the present case, the record indicates that Seay inferred that the Appellant wanted to harm Chafin and that "something was gonna [sic] happen" based upon Appellant's demeanor towards Chafin early on the evening of the victim's death. Upon leaving Seay's apartment with Chafin, Appellant instructed Seay to get in the back of the truck. As they pulled out of the parking lot, Appellant gave Seay a length of string and directed him to "choke [Chafin] 'till [sic] he passed out." After Appellant's third directive to choke Chafin, Seay complied, thereby performing an overt act potentially in furtherance of an agreement to kill or inflict great bodily harm to Chafin. I conclude that on these facts, the panel could have found beyond a reasonable doubt that Appellant entered into a conspiratorial agreement with Seay to kill or inflict great bodily harm on Chafin without premeditation and deliberation, and that the subsequent attempt to choke Chafin amounted to an overt act performed for the purpose of bringing about that murder.

Accordingly, I would affirm the decision of the United States Army Court of Criminal Appeals.