UNITED STATES, Appellee

v.

Bobby D. SEAY II, Sergeant
U.S. Army, Appellant

No. 03-0246/AR

Crim. App. No. 9900779

United States Court of Appeals for the Armed Forces

Argued April 20, 2004

Decided June 30, 2004


CRAWFORD, C.J., delivered the opinion of the Court, in which GIERKE and EFFRON, JJ, joined. ERDMANN, J. filed a separate opinion, dissenting in part, concurring in part, and concurring in the result in which BAKER, J., joined.


Counsel

For Appellant: Captain Fansu Ku (argued); Colonel Robert D. Teetsel and Lieutenant Colonel Mark Tellitocci (on brief); Lieutenant Colonel E. Allen Chandler, Jr.

For Appellee: Captain Michael D. Wallace (argued); Colonel Lauren B. Leeker, Lieutenant Colonel Margaret B. Baines, and Lieutenant Colonel Virginia G. Beakes (on brief).

Military Judges: R. J. Hough and P. J. Parrish.


**THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE FINAL PUBLICATION**.

United States v. Seay, No. 03-0246/AR

Chief Judge CRAWFORD delivered the opinion of the Court.

Contrary to his pleas, Appellant was convicted of conspiracy, premeditated murder, larceny, and kidnapping, in violation of Articles 81, 118, 121, and 134[1]. The convening authority approved the sentence of confinement for life, a dishonorable discharge, total forfeitures, and reduction to the lowest enlisted grade. The Army Court of Criminal Appeals affirmed the findings and sentence in an unpublished opinion. This Court subsequently granted review of the following issues:

I.  WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION IN NOT SUPPRESSING APPELLANT'S PRETRIAL STATEMENTS TO ARMY INVESTIGATORS.

II. IF APPELLANT'S PRETRIAL STATEMENTS SHOULD HAVE BEEN SUPPRESSED (ISSUE I), WHETHER THE REMAINING EVIDENCE IS LEGALLY SUFFICIENT TO SUPPORT FINDINGS OF GUILTY TO ALL CHARGES AND SPECIFICATIONS.

III. WHETHER PORTIONS OF APPELLANT'S STATEMENTS TO ARMY INVESTIGATORS WERE UNCORROBORATED, AND, IF SO, WHETHER THE MILITARY JUDGE ERRONEOUSLY PERMITTED THE PANEL MEMBERS TO CONSIDER THE PERTINENT PORTIONS OF APPELLANT'S STATEMENTS REGARDING THE CHARGE OF LARCENY.

IV. WHETHER THE EVIDENCE IS LEGALLY SUFFICIENT TO SUPPORT A FINDING OF GUILTY TO THE CHARGE THAT APPELLANT STOLE PFC CHAFIN'S WALLET.

V.  WHETHER THE EVIDENCE IN THIS CASE IS LEGALLY SUFFICIENT TO SUPPORT A FINDING TO THE CHARGE THAT APPELLANT KIDNAPPED PFC CHAFIN.

---

[1] Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. §§ 881, 918, 921, and 934 (1994).

For the reasons set forth below, we affirm the findings and sentence.

## FACTS

On the evening of August 29, 1997, Appellant, PFC Jason Chafin, and Sergeant Darrell Shelton went to Appellant's apartment near Colorado Springs, Colorado, after a fight occurred in the local barracks between Chafin and another man. After about 30 minutes – during which Chafin passed out from drinking, and then reawakened – the three left Appellant's apartment in Appellant's truck. Shelton drove the truck, with Chafin seated up front in the passenger seat and Appellant seated behind Chafin armed with a length of cord.

While driving, Shelton directed Appellant to wrap the cord around Chafin's neck and attempt to strangle him. Appellant complied, but was unsuccessful in strangling Chafin, who jumped out of the truck and fled. Shelton ran after Chafin, caught him, and pinned him to the ground. Once Appellant reached them, Shelton handed Appellant the Gerber knife Appellant kept in his truck, and instructed Appellant to stab Chafin. According to Appellant, Chafin asked him, "What have I ever done to you, Bo?" and Appellant whispered back, "Ask the Lord for forgiveness." Appellant stabbed Chafin in the neck and ribs, and then passed the knife to Shelton, who stabbed Chafin a number of times.

Appellant and Shelton fled the scene, leaving Chafin's body in a nearby field. They returned to the scene several days later to take Chafin's wallet and its contents. Chafin's skeletal remains were discovered by hunters four months later.

Upon watching the local media coverage of Chafin's murder, Appellant's wife, Wendy, realized that on the night of the murder, Chafin was in her apartment in the company of her husband and Shelton. With this recollection, Wendy became suspicious of her husband's potential involvement in Chafin's murder. Acting on her suspicions, Wendy contacted Detective Derek Graham of the Colorado Springs Police Department on January 6, 1999.

Wendy told Graham that during the 1997 Labor Day weekend, there was a young man in her apartment whom she had not seen before and whom she subsequently realized was Chafin. She stated that Chafin was very drunk, and that Appellant and Shelton were very rude to him and began kicking him. After 20 to 30 minutes, Appellant, Shelton, and Chafin left the apartment. Appellant returned to the apartment several hours later, at which time Wendy overheard Shelton say something to the effect, "I can't believe you did that."

Over the next several months, she became suspicious because of various events. She overheard Appellant say to Shelton, "No,

4

there hasn't been anything on the news about it. There's nothing in the paper about it."

Wendy also described a telephone call between Appellant and his parents, during which she overheard Appellant stating that "he had done something very bad that was possibly going to get him the death penalty." Wendy further noted to Graham that while she and Appellant watched a movie in which two detectives treated a suspect rudely, Appellant said to her, "You know if someone ever treated me like that, I would kill them." Wendy responded to the effect, "Well you know you can't do that," to which he replied, "Well, I already have gotten away with it."

Finally, Wendy told Graham that Appellant on several occasions asked her to lie to authorities if ever she were questioned, by saying that Chafin was not in their home on the night of the murder. He told her: "Do you remember that night that [Shelton] and I came home? It was just the two of us, you remember that?" Appellant also told Wendy that if the police were to ask about his knife, she should tell them he lost it.

A. First Questioning of Appellant

After speaking with Wendy Seay, Detective Graham went to Appellant's residence. He told Appellant he was investigating the murder of Jason Chafin and asked if Appellant would "be willing to come to the police operation center for an interview." Appellant agreed, and because Appellant's car was

5

out of commission, the police gave him a ride to the police station.  Upon Appellant's arrival at the station, the police informed him of his rights, which Appellant waived.  When Graham indicated to Appellant that Shelton had been implicated in Chafin's murder, Appellant invoked his right to silence.  Graham accordingly terminated the interview and drove Appellant home.  With Appellant's permission, the police videotaped and audiotaped the interview.

B. Second Questioning of Appellant

After Detective Graham returned to his office, he decided to have Wendy make recorded "pretext phone calls" to Appellant, in the hopes of obtaining a confession.  As a courtesy, Graham called Special Agent Chris Barone of the Army Criminal Investigations Command (CID) to inform him of Wendy's implication of Appellant and the planned pretextual calls.  Graham invited both Barone and CID Special Agent Martinez to observe the calls.  Although Graham set the ground rules for the pretextual phone calls, Barone and Martinez offered some suggestions, which Graham accepted or rejected at his discretion.

Pursuant to this plan, Wendy used a phone at the Colorado Springs Police Department office to call Appellant three times at his apartment, over the course of three hours.  Despite Wendy's persistent inquiries, Appellant did not confess to the

murder. Instead, Appellant stated that he wanted to talk to Wendy face to face and during the telephone conversations, he made the following statements to her about obtaining a lawyer:

- You know what – you think I need to get a lawyer.

- Well, why can't I just get a lawyer and not answer no more questions?

- Why don't I just get a lawyer and not answer any more questions?

- I think I need to get a lawyer, Wendy.

- [B]ut for my safety and your safety getting a lawyer might be the best thing to do right now and cooperate with the police through a lawyer and not one on one.

- Can you please wait . . . [s]o I can get a lawyer.

- I think I need to get a lawyer and you can ask if you can go home and tell them.

- Well, everything that's going on tonight. That's why I need a lawyer.

- Can you tell them that things are this serious and I might need to get a lawyer?

- I just ask that you tell the police that . . . [you've] been trying to talk to [your] husband. It seems that he should get a lawyer.

- Can you please [tell the police] . . . that [your husband] thinks he needs a lawyer.

Appellant asked Wendy to call him back after the first call ended. After the last call, Wendy was videotaped to recount what occurred during the conversations. Both local and military authorities agreed at that point that the CID should take over the investigation entirely, which it did.

C. <u>Third Questioning of Appellant</u>

Concerned for Wendy's safety, the CID suggested she meet with Appellant in the CID office rather than at her home. Wendy called Appellant from the CID office, and he agreed to meet her there. Appellant arrived approximately 20 minutes later, at around midnight on January 7, 1999. CID agents frisked Appellant for weapons, and secured his keys and military identification. One agent then led Appellant to the room where Wendy was waiting, which was monitored by an internal video camera and microphone. Appellant was told that his conversation would be recorded. Agent Martinez decided to terminate the conversation when he heard Wendy ask the potentially incriminating question of whether Shelton had planned the murder.

After the conversation ended, Martinez advised Appellant that his cooperation would be appreciated and told him "that anything he said previous to that, we weren't going to use." Appellant agreed to cooperate and was advised by Agent Barone of his rights under Article 31(b)[2], which Appellant waived. The agents asked Appellant to tell them what happened, and Appellant gave a detailed narrative of the murder. Appellant thereafter reviewed his statement, initialed each page, and swore to its accuracy. Later, Barone asked Appellant to provide a second

---

[2] UCMJ, 10 U.S.C. § 831(b) (1994).

sworn statement of confession, as well as a videotaped statement describing the murder. After again waiving his Article 31(b) rights, Appellant gave the requested statements.

DISCUSSION

Issue I. <u>Admissibility of Appellant's Confession</u>

The Supreme Court has held that a subsequent administration of rights warnings may remove the taint when a suspect has already given an unwarned but uncoerced statement. Appellant invoked his right to remain silent before returning to his home following a warned non-custodial interrogation by civilian police. During several pretextual and unwarned telephone calls from his spouse (acting at the request of civilian and military law enforcement officers engaged in a joint investigation), Appellant then made several references as to whether he should get a lawyer. Appellant subsequently presented himself to military authorities, waived his rights after receiving a cleansing warning, and confessed to Chafin's murder. The question before us is whether Appellant's confession is admissible. We conclude that under the facts of this case, Appellant's confession was properly admitted into evidence.

"A military judge's decision to admit or exclude evidence is reviewed for an abuse of discretion."[3] "A military judge abuses his discretion when his findings of fact are clearly

---

[3] <u>United States v. McCollum</u>, 58 M.J. 323, 335 (C.A.A.F. 2003).

9

erroneous, when he is incorrect about the applicable law, or when he improperly applies the law."[4]

The Fifth Amendment in pertinent part guarantees that no suspect "shall be compelled in any criminal case to be a witness against himself." The Supreme Court has interpreted the Fifth Amendment privilege against self-incrimination to encompass two distinct rights: the right to silence and the right to counsel specifically during pretrial questioning.[5] The privilege against self-incrimination is further protected by Articles 27 and 31[6] and Military Rules of Evidence [hereinafter M.R.E.] 305(e) and 305(f).

Given the inherently compelling pressures of custodial police interrogation, the Court enunciated the requirement, in pertinent part, that "if a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms that he has the right to remain silent,"[7] and "has the right to consult with a lawyer and to have the lawyer with him during interrogation."[8] Even after Miranda warnings are

---

[4] United States v. Roberts, 59 M.J. 323, 326 (C.A.A.F. 2004).
[5] Davis v. United States, 512 U.S. 452, 457 (1994); Edwards v. Arizona, 451 U.S. 477 (1981); Miranda v. Arizona, 384 U.S. 436 (1966). The Fifth Amendment right to counsel applies to pretrial interrogation. The Sixth Amendment provides criminal accused the right to counsel during criminal proceedings. United States v. Scott, 51 M.J. 326, 329 (C.A.A.F. 1999).
[6] UCMJ, 10 U.S.C. §§ 827 and 831 (1994).
[7] Miranda, 384 U.S. at 468.
[8] Id. at 471.

given and waived, a suspect may change his mind during questioning and assert these rights.  The Supreme Court in Miranda twice emphasized that if the suspect invokes the right to remain silent or the right to speak to a lawyer, "the police may not question him."[9]

Addressing the concern that the warning requirements would interfere with lawful police investigations, the Supreme Court cited the rights warnings required under Article 31(b) since the adoption of the Uniform Code of Military Justice in 1951.[10] Under Article 31(b):

> No person subject to this chapter may interrogate, or request any statement from an accused or person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

In United States v. Tempia,[11]  the military explicitly adopted the Miranda warning requirements.

Amplifying Miranda as to a suspect's right to silence, the Supreme Court in Michigan v. Mosley,[12] stated:

> We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on

---

[9] Id. at 444-45, 474.
[10] Miranda, 384 U.S. at 489.
[11] 16 C.M.A. 629, 37 C.M.R. 249 (1967).
[12] 423 U.S. 96, 100 (1975).

whether his "right to cut off questioning" was "scrupulously honored."[13]

As to a suspect's right to counsel in a Miranda context, the Court in Edwards opined:

> [W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.[14]

While Mosley protects the right to remain silent, Edwards protects the right to counsel. The "scrupulously honored" test in Mosley differs from Edwards because under Edwards the accused must initiate further communications or exchanges with police. Both Mosley and Edwards were adopted in M.R.E. 305(e) and (f).

Appellant's numerous references to counsel did not affect Appellant's confession because Appellant did not make an unambiguous request for counsel.[15] Appellant's references to counsel did not occur during the custodial interrogation.[16]

---

[13] See also M.R.E. 305(f)(1).
[14] Id. at 485. See also M.R.E. 305(e)(1) and (f)(2).
[15] See Davis.
[16] United States v. Schroeder, 39 M.J. 471, 474 (C.M.A. 1994)("[A]ppellant's request was too little and too early to qualify as an invocation of Miranda under applicable Supreme Court precedent."). See generally People v. Villalobos, 737 N.E.2d 639, 642-46 (Ill. 2000)(canvassing Federal and State

We hold that even assuming Appellant's Fifth Amendment rights, Article 31(b), and the Military Rules of Evidence were violated by the authorities' continued interrogation of Appellant despite his invocation of the right to silence during the first questioning, the failure to provide Appellant appropriate rights warnings during the pretextual phone calls, and the failure to terminate the pretextual phone calls, Appellant's eventual confession was untainted.  The Supreme Court has recognized that

> [a] subsequent administration of [rights] warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement.  In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.[17]

Accordingly, in United States v. Marquardt[18] this Court held that subsequent rights warnings may effect a "purging of the taint" from prior unwarned statements.[19]

---

rulings concerning whether a suspect can successfully invoke the Miranda right to counsel before a custodial interrogation has begun and concluding that "one cannot anticipatorily invoke the right to counsel prior to custodial interrogation").
[17] Oregon v. Elstad, 470 U.S. 298, 314 (1985).
[18] 39 M.J. 239 (C.M.A. 1994).
[19] Id. at 241.  See also United States v. Vaughters, 44 M.J. 377, 378 (C.A.A.F. 1996) (custodial interrogation may be reinitiated without counsel being present where a suspect is provided a meaningful opportunity to consult with counsel, and subsequently waives his right to counsel); United States v. Wimberley, 16 U.S.C.M.A. 3, 9, 36 C.M.R. 159, 165 (1966) (after tainted first statement, passage of time, fact that a different agent took

Appellant's confession did not derive from either the initial interview by Detective Graham, or the pretextual phone calls which followed. In fact, no statements from Appellant's first or second questioning were admitted into evidence at trial. Rather, Appellant confessed to Chafin's murder on a third occasion, after having voluntarily driven to the CID office and met with his wife. Immediately prior to Appellant's confession on this occasion, Mrs. Seay was removed from the room and a CID agent administered new rights warnings, as well as a "cleansing warning" advising Appellant that the CID would not use against Appellant anything Appellant had previously said. After receiving these warnings, Appellant waived his rights, and only then gave his voluntary confession.

In short, immediately prior to Appellant's confession, "[h]e was thus reminded again that he could remain silent and could consult with a lawyer, and was carefully given a full and fair opportunity to exercise these options."[20] Appellant waived those rights anew, and in so doing created a clean slate for his confession.

Because Appellant's confession was untainted by prior events, the military judge did not abuse his discretion in

_____

second statement, and new Article 31 rights advisement before second statement erases taint).

[20] Mosley, 423 U.S. at 104-05.

14

admitting the confession into evidence at trial.  As a result of this conclusion, Issue II becomes moot.

   Issues III and IV.  <u>Appellant's Conviction of Larceny of PFC Chafin's Wallet</u>

    Issues III and IV concern Appellant's conviction of larceny of PFC Chafin's wallet, alleged in Charge IV.  Appellant's written confession contained the following exchange as to the wallet:

> Q:  What happened to CHAFIN's wallet?
>
> A:  At the time CHAFIN was stabbed, it was in his pocket.  SHELTON and I went back to CHAFIN's body sometime after that night and SHELTON took the wallet.  SHELTON had found out there was money in the wallet after the unit started saying he was missing, so he wanted to go back for the money.  We went back on some night and tried to find the body by trial and error.  SHELTON wanted me to go out and look for the body and I did not want to.  I would go out into the field, lay down, and then go back to the car.  Finally, SHELTON got out and went straight to the body.  He came back with CHAFIN's wallet and got into the car. . . .
>
> Q:  What did SHELTON do with the wallet?
>
> A:  I saw him go through the wallet and take out some money.  I don't remember how much but there was a lot.  He gave me some of the money but I don't remember how much it was.  SHELTON through [sic] something out of the window.  I don't remember was [sic] it was but it may have been the wallet. . . .
>
> Q:  Where did SHELTON throw the wallet out of the car?
>
> A: I don't remember.  It was somewhere before we got back to town.

15

CID Special Agent Barone testified that a wallet was not found among Chafin's effects during a postmortem inventory.

Appellant first avers that the military judge improperly admitted into evidence Appellant's uncorroborated confession as to the larceny charge. Appellant further contends that even if his confession were admissible, the evidence of larceny of Chafin's wallet is insufficient, as the only evidence to support Appellant's statement that his accomplice, Shelton, took the wallet was a CID investigator's testimony that a wallet was not found among PFC Chafin's effects. We disagree on both accounts.

"An admission or a confession of the accused may be considered as evidence against the accused on the question of guilt or innocence only if independent evidence, either direct or circumstantial, had been introduced that corroborates the essential facts admitted to justify sufficiently an inference or their truth."[21]

> The corroboration requirement for admission of a confession at court-martial does not necessitate independent evidence of all the elements of an offense or even of the corpus delicti of the offense. Rather, the corroborating evidence must raise only an inference of truth as to the essential facts admitted. Moreover, while the reliability of the essential facts must be established, it need not be done beyond a reasonable doubt or by a preponderance of the evidence.[22]

---

[21] M.R.E. 304(g).
[22] United States v. Cottrill, 45 M.J. 485, 489 (C.A.A.F. 1997) (internal citations omitted).

16

Both M.R.E. 304(g) and Cottrill set forth a very low standard. It is not necessary for the members to conclude that Chafin carried a wallet. The issue is whether the facts justify the inference as to the truth of the confession: Appellant and the other person named in the confession were seen with the victim shortly before he disappeared; the victim died as a result of foul play; the victim's body was found in a concealed place; the post-mortem revealed no wallet; and no wallet was ever found. For the purposes of corroborating a confession, there is no requirement that the members conclude beyond a reasonable doubt, or even by a preponderance of the evidence, that the corroborating facts alone (i.e., without the confession) establish that this victim, in fact, carried a wallet at the time of death; rather, the rule simply requires a presence of facts that enable the members to infer the truth of the essential facts in the confession. When a person confesses to participation in the larceny of a wallet, it is reasonable to infer the truth of the confession from the fact that the victim named in the confession knew the Appellant, died as a result of foul play, was found in a concealed place, and did not have a wallet at the time or thereafter. We therefore hold that these reasonable inferences adequately corroborated Appellant's confession, and we therefore find no merit in Issue III. Regarding Issue IV, we also hold that the properly corroborated

confession adequately established the essential elements of larceny beyond a reasonable doubt to support Appellant's larceny conviction.

Issue V.  Appellant's Conviction of Kidnapping PFC Chafin

Finally, Issue V questions the legal sufficiency of the evidence supporting Appellant's kidnapping conviction.  For the following reasons, we hold that the evidence was legally sufficient to support Appellant's kidnapping conviction.

As noted above, "[t]he test for legal sufficiency of the evidence is whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"[23]  This Court reviews questions of legal sufficiency de novo.[24]

The Uniform Code of Military Justice punishes kidnapping as an offense to the prejudice of good order and discipline or of a nature to bring discredit to the armed forces, under Article 134.  The Manual for Courts-Martial [MCM] lists the elements of kidnapping as follows:

> (1) That the accused seized, confined, inveigled, decoyed, or carried away a certain person;
> (2) That the accused then held such person against that person's will;

---

[23] United States v. Riley, 58 M.J. 305, 311 (C.A.A.F. 2003) (quoting Jackson, 443 U.S. at 319).
[24] Id.

(3) That the accused did so willfully and wrongfully; and

(4) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.[25]

To determine whether the asportation – or the "carrying away"[26] – of an individual is more than an incidental or momentary detention, this Court considers the following factors:

a. The occurrence of an unlawful seizure, confinement, inveigling, decoying, kidnapping, abduction or carrying away and a holding for a period. Both elements must be present.

b. The duration thereof. Is it appreciable or de minimis? This determination is relative and turns on the established facts.

c. Whether these actions occurred during the commission of a separate offense.

d. The character of the separate offense in terms of whether the detention/asportation is inherent in the commission of that kind of offense, at the place where the victim is first encountered, without regard to the particular plan devised by the criminal to commit it. . . .

e. Whether the asportation/detention exceeded that inherent in the separate offense and, in the circumstances, evinced a voluntary and distinct intention to move/detain the victim beyond that necessary to commit the separate offense at the place where the victim was first encountered. . . .

f. The existence of any significant additional risk to the victim beyond that inherent in the commission of the separate offense at the place where the victim is first encountered. It is immaterial that the

---

[25] MCM, Part IV, para. 92.b.
[26] Black's Law Dictionary 109 (7th ed. 1999) (defining "asportation").

additional harm is not planned by the criminal or that it does not involve the commission of another offense.[27]

In the case at bar, Appellant's confession, which the military judge found to be voluntary and credible, and the forensic evidence of the murder, including Chafin's body and the crime scene itself, establish the following.  While Chafin was seated as a passenger in Appellant's truck, en route to a remote location several miles from Appellant's apartment, Appellant strangled Chafin from behind with a cord, thereby confining Chafin and holding him against his will in the truck.  When Chafin attempted to flee from the truck, Shelton pinned him to the ground, while Appellant stabbed him, thereby further holding Chafin against his will.  These acts of restraint and asportation occurred prior to the actual murder, and exceeded those acts inherent to the commission of murder, as Appellant and Shelton could have killed Chafin in the apartment, or in the truck before Shelton drove to a secluded location.  Appellant experienced an increased risk as a result of these acts, as he was less likely to find help in the secluded location to which he was driven.

---

[27] United States v. Santistevan, 22 M.J. 538, 543 (N.M.C.M.R. 1986) (internal citations omitted); see also United States v. Newbold, 45 M.J. 109, 112 (C.A.A.F. 1996) (endorsing Santistevan factors).

We therefore hold that a reasonable trier of fact could find beyond a reasonable doubt that the elements of kidnapping were satisfied: that Appellant confined Chafin and held him against his will in the truck, that Appellant did so willfully and wrongfully, and that this conduct was prejudicial to good order and discipline in the military, as well as service-discrediting.

## DECISION

The decision of the United States Army Court of Criminal Appeals is affirmed.

United States v. Seay II, No. 03-0246/AR

ERDMANN, Judge (dissenting in part, concurring in part and concurring in the result):

I concur with the majority on Issues I, II and V. I respectfully dissent from their resolution of Issues III and IV. I find no corroboration of the confession to larceny and would reverse the Army Court of Criminal Appeals on Issue III, rendering Issue IV moot.

The corroboration requirement for admission of a confession at court-martial requires independent evidence which establishes the trustworthiness of the confession.[1] The purpose of the corroboration rule "is to prevent 'errors in convictions based upon untrue confessions alone' or suspect convictions based upon words which might 'reflect the strain and confusion' caused by 'the pressure of a police investigation.'"[2]

Although we have described the quantum of independent evidence required for corroboration as "slight,"[3] Military Rule of Evidence 304(g)(1) still requires that it be sufficient to raise an inference of the truth of the essential facts admitted. "Slight" in this context does not mean the barest wisp of possibility. An inference of truth is raised only when "there is substantial independent evidence that the offense has been

_____

[1] United States v. Maio, 34 M.J. 215, 218 (C.M.A. 1992).
[2] United States v. Yeoman, 25 M.J. 1, 4 (C.M.A. 1987)(quoting Smith v. United States, 348 U.S. 147, 153 (1954)).
[3] Yeoman, 25 M.J. at 4.

1

committed."[4]  Here, there is simply no independent evidence,
substantial or otherwise, that a larceny has been committed.

The majority opinion concludes that Seay's confession to
larceny of Chafin's wallet was sufficiently corroborated, but
base that conclusion on a skein of inferences that arise from
facts unessential to the offense of larceny:

> When a person confesses to participation in the
> larceny of a wallet, it is reasonable to infer
> the truth of the confession from the fact that
> the victim named in the confession knew the
> Appellant, died as a result of foul play, was
> found in a concealed place, and did not have a
> wallet at the time or thereafter.  We therefore
> hold that these reasonable inferences adequately
> corroborated Appellant's confession[.]

Relying on these inferences as independent evidence, the
majority opinion stretches the corroboration requirement beyond
the breaking point.  The corroboration rule requires independent
evidence upon which inferences can be drawn, not inferences
which substitute for evidence.  Apart from the confession
itself, no evidence suggests that Chafin ever possessed a wallet
at all, much less that he was carrying one at the time of his
murder.

The majority opinion notes that "[i]t is not necessary for
the members to conclude that Chafin carried a wallet."  However,
without evidence that Chafin possessed a wallet, we can give no

---

[4] United States v. Melvin, 26 M.J. 145, 146 (C.M.A. 1988)
(quoting Smith v. United States, 348 U.S. at 156)).

weight to the fact that no wallet was found.  There is no fact from which the essential truth of the confession may be inferred:  i.e., that a wallet was stolen.

We have previously held that there was insufficient corroboration to illegal drug use where independent evidence showed only that the appellant had the opportunity to ingest illegal drugs and was with friends who had previously used illegal drugs.[5]  Similarly, we have found insufficient corroboration to child abuse where independent evidence showed only that the accused parent had access and opportunity.[6]  In this latter case, United States v. Faciane, we noted that "[a]lthough the Government argues that appellant's exclusive custody of the child establishes that he had access and the opportunity to abuse her, we are unwilling to attach a criminal connotation to the mere fact of a parental visit."[7]

The fact that the victim's body was found in a concealed place, that he died as the result of foul play, that he knew Seay, and that a wallet was not found with the body is simply not enough to "corroborate[] the essential facts [of the larceny] to justify sufficiently an inference of their truth."[8] Lacking substantial independent evidence that a larceny was

---

[5] United States v. Rounds, 30 M.J. 76 (C.M.A. 1990).
[6] United States v. Faciane, 40 M.J. 399, 403 (C.M.A. 1994).
[7] Id.
[8] Military Rule of Evidence 304(g).

committed, the military judge erred by admitting Seay's confession to the larceny as evidence against him.

I would therefore reverse the decision of the Court of Criminal Appeals as to Issue III and set aside Seay's conviction for larceny, thus mooting Issue IV. Nonetheless, because Seay's sentence would be unaffected by this change as a result of his mandatory minimum life sentence for premeditated murder,[9] I concur in the result.

---

[9] Article 118, Uniform Code of Military Justice, 10 U.S.C. § 918 (2000).