# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
KERN, ALDYKIEWICZ, and MARTIN
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Specialist CHRISTOPHER L. MOYERS**
**United States Army, Appellant**

ARMY 20110975

Headquarters, Fort Bliss
David H. Robertson, Military Judge
Colonel Francis P. King, Staff Judge Advocate

For Appellant: William E. Cassara, Esquire (argued); William E. Cassara, Esquire; Captain John L. Schriver, JA (on brief); William E. Cassara, Esquire; Captain Brian D. Andes, JA (on reply brief).

For Appellee: Captain T. Campbell Warner, JA (argued); Colonel John P. Carrell, JA; Lieutenant Colonel James L. Varley, JA; Major Catherine L. Brantley, JA; Captain T. Campbell Warner, JA (on brief).

31 March 2014

------------------------------------
MEMORANDUM OPINION
------------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

KERN, Senior Judge:

A military judge sitting as a general court-martial convicted appellant, contrary to his pleas, of violating a lawful general regulation; knowingly becoming a member of, or affiliating with, a group which encouraged the violent overthrow or destruction of the United States Government; and advising, counseling and urging disloyalty and mutiny by members of the Armed Forces, in violation of Articles 92 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 892, 934 (2006) [hereinafter UCMJ].[1] The military judge sentenced appellant to a dishonorable

---

[1] The two Title 18 provisions assimilated under Clause 3 of Article 134, UCMJ, were 18 U.S.C. § 2385 and 18 U.S.C. § 2387.

discharge, four years confinement, and reduction to the grade of E-1.  The convening authority approved the adjudged sentence.

This case is before us pursuant to Article 66, UCMJ.  Two of appellant's five assignments of error warrant discussion, but only one warrants relief.[2]  We agree with appellant's assertion the evidence was legally and factually insufficient to sustain his conviction under Article 92, UCMJ, and we grant relief in our decretal paragraph.  We also address appellant's assertion that his confession was uncorroborated.

## BACKGROUND

At the time of the incidents that led to the court-martial, appellant was a military policeman with approximately three years of service.  He was married, twenty-one years of age, and had a General Technical (GT) score of 94.

Several soldiers in appellant's unit, including the appellant, were friends with a married couple, Specialist (SPC) JD and his wife, Mrs. KR.  The couple had permission of a land owner to camp and spend time on private property in the desert outside of Fort Bliss, Texas.  They named their camp "the Outpost."  The couple and their friends began frequenting the Outpost beginning in 2008.  The group had picnics and BBQs, and the soldiers would target shoot at cans, bottles, and abandoned vehicles on the property.  Mrs. KR, who liked the outdoors and would frequently go running in the desert and the surrounding mountains, considered the location to be a "peaceful" place.

Appellant was deployed to Iraq from February 2009 to February 2010.  During his mid-tour leave, appellant purchased a weapon from his uncle.  After he redeployed, he purchased several more weapons of varying types.  By the time of the investigation, he owned a Springfield XD .45 caliber pistol, an AK-47, a Remington 870 12-gauge shotgun, and a Mossberg 30-06 rifle with a scope.

When appellant redeployed to Fort Bliss in 2010, he began to visit the Outpost, but not as regularly as some other soldiers. He also spent time with SPC JD and Mrs. KR at their apartment and other locations. During one of these visits, Mrs. KR overheard appellant speaking to her husband, and although she did not hear the entire conversation, she heard the term "militia."  She became alarmed, and cautioned appellant that soldiers were not allowed to join a militia.

---

[2] The other assignments of error involve a claim that Specification 2 of renumbered Charge V (a violation of 18 U.S.C. § 2385) fails to state an offense and claims challenging the sufficiency of the evidence.

Sometime later, appellant was again visiting the home of SPC JD and Mrs. KR. Mrs. KR saw appellant carrying patches out to a group of soldiers on the patio. She could not see the insignia, but noted that he seemed to pass the patches out to the soldiers gathered outside. In June 2010, appellant, along with several other soldiers from the unit, were again visiting at her home. She heard appellant use the word militia again. She became angry, and told him not to use that word in her home.

One soldier, Private First Class (PFC) JL, testified that appellant spoke with him regarding a group. Appellant stated that PFC JL would serve as a lieutenant, and would be required to purchase a uniform. However, PFC JL did not take him seriously, and believed that appellant was just speaking about his political views and his general dissatisfaction with the government. Appellant never called the group a militia, nor did he discuss that the group's aim was to overthrow the government. Private First Class JL also testified that when visiting appellant's apartment, he saw a uniform alongside a unique patch. He also testified the insignia on the patch was based on the movies and video game, *Resident Evil*.[3]

In September 2010, Mrs. KR learned that a group of soldiers was under investigation for being involved in a militia. She contacted appellant because she was concerned that her husband was going to be implicated. Appellant sent her a series of incriminating texts that included the following:[4]

> That is because civil ways won't work and my people
> want to stop the corruption
>
> To tell you the truth I hate violence but sometimes it is
> necissary I don't want it to resort to that but unfortunately
> it probably will and I will be re
>
> ady to stand up and follow through with what I swore to
>
> I am not bored and I can't fully restore the U.S. back to the
> way our founding fathers made it but ill do my best and
> force is the only way we will win a

---

[3] *Resident Evil* is a video game that inspired a science fiction film series. The plot involves a zombie apocalypse.

[4] These text messages have many misspellings and grammatical errors. Additionally, these texts were introduced into evidence as photographs of the messages as seen on Mrs. KR's phone. Therefore, some messages required two or more photographs to display completely.

> nd take out our own countries tyrant
>
> I know that it is a forceful combative organization.
> I know what I'm forming
>
> Once the tyrant has been taken out restore order and
> the government how it was initially created
> Remove unconstitutional amendments. And then leave it
> up to the people to elect a new president. To prevent all of
> the corrupt poliyicians from controli

Each message was signed "KILLER."

Mrs. KR was concerned by this exchange, and eventually notified Criminal Investigation Command (CID). Based on the alleged threats to the President, CID notified the United States Secret Service. Agents from the Secret Service searched appellant's home and his computer.

The forensic exam of appellant's computer revealed several incriminating documents. The documents reference a "Dark Horse" organization which appellant described as a special task force within the U.S. Army's Special Forces. He referred to the actual Commanding General of U.S. Army Special Operations Command, Lieutenant General Mulholland, as the Commander of this special group. He used an insignia based on one of the patches as "The Official Emblem of Dark Horse," and used the regimental crest for the U.S. Army Special Forces as well as the Seal of the Department of Defense on some of the documents. The purpose of the group was to "stand up and defeat the continuing corruption in our government as well as **protect** and **defend** the U.S. Constitution against all enemies **foreign** and **domestic**." (emphasis in original). The documents also refer to promotions within the organization, soldier's values, and other rules and regulations. The documents contain, *inter alia*, a timeline covering President Obama's tenure in office, starting when he took the oath of office, and continuing up to the current events. It characterizes the President's actions as similar to Hitler in Germany in the 1930s and refers to President Obama as "the tyrant." The documents include an oath of enlistment, rules of engagement, procedures for escalation of force, equipment and uniform wear for the soldiers in the unit, and a chain of command. The forensic exam did not reveal, however, any link to any material that advocated racial, gender, or ethnic hatred or intolerance; it also did not reveal any evidence of material related to illegal discrimination based on race, color, gender, religion, or national origin. Finally, the exam did not provide any evidence that appellant or the Dark Horse organization advocated the use of force or violence to deprive individuals of their rights under the United States Constitution.

In a pretrial statement made to Special Agent (SA) Day from CID, appellant spoke in detail about his personal political beliefs, the purpose of the "Dark Horse" organization, and how the group evolved. Appellant stated that he originally ordered the patches when he was deployed to Iraq in 2009 because he hoped to put together a paintball team with fellow soldiers. The paintball group never worked out, and instead his idea for a group evolved into a militia. The intention of the organization was to support and defend the Constitution, and was designed to fight alongside the military if need be, if the government "goes corrupt," and if they needed to respond. He likened it to making contingency plans. While he admitted to sending the texts, he stated that while he was angry at the time of the communication, he did not have any current intent to overthrow the government. Appellant also stated that he was upset with his unit leadership at the time he sent the texts because they did not process his Basic Allowance for Housing request in a timely manner following his marriage.

At trial, the government did not call any members of the so-called "Dark Horse" militia to testify. Instead, the government relied on testimony from Mrs. KR, PFC JL, and law enforcement. The government also admitted, *inter alia*, the texts sent by appellant to Mrs. KR, the Dark Horse documents from appellant's computer, patches found in appellant's home, weapons found in appellant's home, photos of appellant posing with a weapon, and photos of other soldiers in appellant's unit at the Outpost firing weapons and standing near the campfire. Finally, the prosecution admitted Appellant's video-recorded interview with SA Day. The defense did not file a motion to suppress appellant's confession. However, during a Rule for Courts-Martial [hereinafter R.C.M.] 917 motion, the defense argued that the evidence was insufficient in part because of a lack of corroborating evidence regarding appellant's confession. Having already admitted appellant's confession in its entirety, the military judge found there was sufficient corroborating evidence and denied the defense's R.C.M. 917 motion.

## LAW AND DISCUSSION

*Standard of Review for Legal and Factual Sufficiency*

This court reviews legal sufficiency issues de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). In conducting our review, we must determine "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Article 66(c), UCMJ, requires the Court of Criminal Appeals to conduct a de novo review of the factual sufficiency of the case. *See United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990). The review "involves a fresh, impartial look at the

5

evidence, giving no deference to the decision of the trial court on factual sufficiency beyond the admonition in Article 66(c), UCMJ, to take into account the fact that the trial court saw and heard the witnesses." *Washington*, 57 M.J. at 399. This court "applies neither a presumption of innocence nor a presumption of guilt," but "must make its own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Id.*

### *Army Regulation 600-20, Army Command Policy*

The government charged appellant with violating Dep't of Army Reg. 600-20, Army Command Policy [hereinafter AR 600-20], para. 4-12 (18 Mar. 2008), by "wrongfully participating in an extremist organization." The beginning of paragraph 4-12 emphasizes the importance of treating all soldiers equally without regard to race, color, religion, gender, or national origin as a matter of Army policy. Furthermore, the section states that it is incumbent upon the command to enforce this policy, and it is "vitally important to unit cohesion and morale." The paragraph goes on to prohibit participation in extremist organizations, and defines these groups as

> ones that advocate racial, gender, or ethnic hatred or intolerance; advocate, create, or engage in illegal discrimination based on race, color, gender, religion, or national origin, or advocate the use of or use force or violence or unlawful means to deprive individuals of their rights under the United States Constitution or the laws of the United States, or any State, by unlawful means.

The regulation also expressly provides that paragraph 4-12 must be used in conjunction with Dep't of Def. Dir. 1325.6 [hereinafter DOD Dir. 1325.6], Guidelines for Handling Dissident and Protest Activities Among Members of the Armed Forces (1 October 1996).[5]

### *DOD Instr. 1325.06, Guidelines for Handling Dissident and Protest Activities Among Members of the Armed Forces.*

This Instruction provides the following regarding prohibited activities:

> a. Military personnel must not actively advocate supremacist doctrine, ideology, or causes, including those that advance, encourage, or advocate illegal discrimination

---

[5] DOD Dir. 1325.6 was subsequently reissued as Dep't of Def. Instr. 1325.06, Guidelines for Handling Dissident and Protest Activities Among Members of the Armed Forces [hereinafter DOD Instr. 1325.06] (27 Nov. 2009).

based on race, creed, color, sex, religion, ethnicity, or national origin or that advance, encourage, or advocate the use of force, violence, or criminal activity or otherwise advance efforts to deprive individuals of their civil rights.

b.  Military personnel must reject active participation in criminal gangs pursuant to section 544 of Public Law 110-181 (Reference (i)) and in other organizations that advocate supremacist doctrine, ideology, or causes; attempt to create illegal discrimination based on race, creed, color, sex, religion, ethnicity, or national origin; *advocate the use of force, violence, or criminal activity*; or otherwise engage in efforts to deprive individuals of their civil rights.  Active participation in such gangs or organizations is prohibited.  Active participation includes . . . ; or otherwise engaging in activities in furtherance of the objective of such gangs *or organizations that are detrimental to good order, discipline, or mission accomplishment or are incompatible with military service*.

DOD Instr. 1325.06, encl. 3, para. 8.a., b.  (emphasis added).

*Army Pamphlet 600-15, Extremist Activities*

Additionally, AR 600-20 points to Dep't of Army Pam. 600-15, Extremist Activities [hereinafter DA Pam. 600-15] (1 June 2000), for guidance on implementing Army policy on extremist activities and organizations.  The stated objectives for DA Pam 600-15 are centered on creating an "environment free of harassment and maltreatment."  The foreword and the overview of this pamphlet concentrate almost entirely on the problems associated with hate crimes, and provide definitions and examples consistent with that focus.

**The Specification of Charge III**

The Specification of Charge III alleged the following violation of AR 600-20:

In that [appellant], U.S. Army, did, at or near El Paso, Texas, between on or about 1 May 2009 until on or about 12 October 2010, fail to obey a lawful general regulation, to wit: paragraph 4-12, Army Regulation 600-20, dated 18 March 2008, by wrongfully participating in an extremist organization.

The plain language of AR 600-20, paragraph 4-12, demonstrates it is designed to prohibit extremist activities that target people based on race, creed, color, sex,

religion, ethnicity, or national origin in violation of their legal rights. The entire focus of the paragraph is the prevention of hate crimes in the Army and membership by soldiers in organizations that espouse discriminatory ideologies.

Likewise, DA Pam. 600-15 is intended to address problems with groups that are discriminatory in nature. The pamphlet provides examples of recent cases involving hate crimes, and provides the same definition for extremist activities as that found in the Army Regulation.[6]

While the most current version of DOD Instr. 1325.06, dated 22 February 2012, provides a more comprehensive definition of prohibited activities by service members, the version in effect at the time of appellant's court-martial was limited in scope. Like the Army regulation, the Instruction focuses on those groups that "deprive individuals of their civil rights." Indeed, the wording of paragraph 8.a. of the DOD Instr. is almost identical to that contained in paragraph 4-12 of AR 600-20. Paragraph 8.b. is slightly different, in that it also prohibits criminal gang participation by service members, and adds a semi-colon between the phrase "use of force, violence, and criminal activity" and the phrase "or otherwise engage in efforts to deprive individuals of their civil rights." Later in the same paragraph, the text focuses on prohibited activities, and at first glance, provides a broader definition of the types of organizations that are considered "detrimental to good order, discipline, or mission accomplishment or are incompatible with military service." Given the overall context of the paragraph and the placement of this phrase, however, a better reading is that this phrase modifies the types of prohibited activities rather than the types of prohibited organizations.

In this case, the government charged appellant with violating a lawful general regulation by participating in an extremist organization. The government presented no evidence that appellant engaged in activities that were consistent with how AR 600-20, DA Pam. 600-15, or DOD Instr. 1325.06 defined extremism or engaging in prohibited activities in support of such extremist organizations. The language provided by the regulation, even as modified by the Instruction and the DA Pam., is at best, ambiguous. Unlike a statute, we do not have the legislative history to fill in the gaps. We do, however, have the context provided by these documents. The objectives, foreword, and examples provided by the Department of the Army and the Department of Defense in the various documents demonstrate that at their core, these documents are focused on organizations that follow a discriminatory ideology and advocate that certain individuals should be deprived of their civil rights. Therefore,

---

[6] The government points out that Appendix B of DA Pam. 600-15, includes a lesson plan that defines an extremist organization as one that "advocate[s] or seek[s] to overthrow the Government of the United States, or any State by unlawful means." While this definition is much broader, it is only contained in an appendix to an Army pamphlet. As such, it is persuasive, but not controlling.

we find the evidence is legally and factually insufficient to sustain a conviction for violating Article 92, UCMJ.

**Specification 2 of Renumbered Charge V**

We also briefly comment on appellant's claim that the evidence insufficiently corroborates his confession regarding violating 18 U.S.C. § 2385 (renumbered Specification 2 of renumbered Charge V). The government charged appellant with knowingly becoming a member of, or affiliating with, a group which encouraged the overthrow or destruction of the Government of the United States by force or violence. As a threshold matter we note that the government not only admitted appellant's confession to SA Day, but also admitted, *inter alia*, other statements from appellant, including his text messages to Mrs. KR; the statements from appellant mentioning militias that Mrs. KR overhead; the incriminating Dark Horse organizational documents found on appellant's computer; and appellant's conversation with PFC JL, where appellant first asked PFC JL to join his group at the rank of lieutenant, then indicated that PFC JL would obtain a uniform and receive patches and rank, and finally stated that the group was against enemies foreign and domestic.

We further conclude that independent evidence in the record sufficiently corroborates appellant's confession. Military Rule of Evidence 304(g). Corroborating evidence need not confirm each element of an offense, but rather must "corroborate[] the essential facts admitted to justify sufficiently an inference of their truth." *Id.* This inference may be drawn from a quantum of corroborating evidence that our superior court has described as "very slight." *United States v. Melvin*, 26 M.J. 145, 146 (C.M.A. 1988).

Upon review of the record, we note the following evidence separate from the aforementioned statements and documents. First, PFC JL testified that he saw a multicam uniform with a patch with a skull and a spade and also saw a separate umbrella patch at appellant's apartment. Second, Mrs. KR testified that she saw appellant handing out patches to other people. Third, the government also introduced photographs of individuals posing with and firing weapons while wearing paramilitary-style clothing, some of which included Dark Horse insignias, including a patch with a skull and a spade. Fourth, the government presented evidence of appellant's ownership of multiple weapons, including an AK-47 and appellant's use of weapons at the Outpost. In our view, reasonable inferences arising from this independent evidence sufficiently corroborate the essential truth of appellant's confession – that is, appellant's confession that he became a member of, or affiliated with, a group which encouraged the overthrow or destruction of the Government of the United States by force or violence. We find the evidence as a whole is legally

9

and factually sufficient to sustain appellant's conviction for violating 18 U.S.C. § 2385.[7]

## CONCLUSION

On consideration of the entire record and the assigned errors, the finding of guilty with respect to the Specification of Charge III is set aside and Charge III and its Specification are dismissed. The remaining findings of guilty are AFFIRMED.

We are able to reassess the sentence on the basis of the error noted and do so after conducting a thorough analysis of the totality of the circumstances presented by appellant's case, and in accordance with the principles articulated by our superior court in *United States v. Winckelmann*, 73 M.J. 11, 15-16 (C.A.A.F. 2013) and *United States v. Sales*, 22 M.J. 305 (C.M.A. 1986).

In evaluating the *Winckelmann* factors, we find no dramatic change in the penalty landscape or exposure which might cause us pause in reassessing appellant's sentence, as the maximum punishment is reduced by only two years. We also note that although this was a contested trial, it was a trial by military judge-alone. Finally, we find the nature of the remaining offenses capture the gravamen of the criminal misconduct.

Reassessing the sentence based on the noted error, the amended finding of guilty, and the entire record, the sentence is AFFIRMED. All rights, privileges, and property, of which appellant has been deprived by virtue of that portion of the findings set aside by this decision, are ordered restored.

Judge ALDYKIEWICZ concurs.


MARTIN, Judge, concurring in part, dissenting in part.

While I agree with the majority's decision that the evidence supporting appellant's Article 92, UCMJ, conviction is legally and factually insufficient, I respectfully dissent with my colleagues regarding their decision as to Specification 2

---

[7] We further note that defense counsel affirmatively told the military judge that she had no objection to the admission of his confession due to lack of corroboration. Thus, appellant has waived the issue of whether his confession is sufficiently corroborated for purposes of admissibility. However, we also note appellant has not waived the question of what weight this court should give appellant's confession in light of the corroborating evidence.

of Charge V.[8]  I believe the evidence is factually insufficient to sustain a 18 U.S.C. § 2385 conviction.

In affirming appellant's conviction for this offense, the majority finds appellant's confession to be sufficiently corroborated to sustain the offense.  I disagree.  Military Rule of Evidence [hereinafter Mil. R. Evid.] 304(g) states:

> An admission or a confession of the accused may be considered as evidence against the accused on the question of guilt or innocence only if independent evidence, either direct or circumstantial, has been introduced that corroborates the essential facts admitted to justify sufficiently an inference of their truth . . . . If the independent evidence raises an inference of the truth of some but not all of the essential facts admitted, then the confession or admission may be considered as evidence against the accused only with respect to those essential facts stated in the confession or admission that are corroborated by the independent evidence.

*See also United States v. Seay*, 60 M.J. 73, 79 (C.A.A.F. 2004) (finding that "the corroborating evidence must raise only an inference of truth as to the essential facts admitted.").  Although the standard to corroborate the confession is very low, the central issue remains "whether the facts justify the inference as to the truth of the confession."  *Seay*, 60 M.J. at 80.  My review of the confession is that the evidence provided in the record reveals insufficient corroboration to find appellant guilty of violating 18 U.S.C. § 2385.

The "Smith Act," 18 U.S.C. § 2385, has several components.  The government chose to charge appellant with a violation of the so-called membership clause, that he did "knowingly become a member of, or affiliate with, a group which encouraged the overthrow or destruction of the Government of the United States by force or violence."

Appellant asserts, and the government concedes, the trial counsel plainly erred in failing to allege appellant specifically intended to bring about the violent overthrow of the government as speedily as circumstances would permit.[9]  While I agree the specification is defective, I also agree the appellant suffered no material

---

[8]  This offense was originally numbered Specification 3 of Charge VI but was re-numbered by the military judge after entry of pleas as Specification 2 of Charge V.

[9]  While the membership clause of the Smith Act does not expressly provide for the specific intent element, it is implied.  *Scales v. United States*, 367 U.S. 203, 221-222 (1961).

prejudice to a substantial right because there is notice of the element in the record. Instead, my concerns with the charge are focused on the adequacy of the evidence. I believe there is insufficient evidence of the existence of a group that advocated the overthrow of the government. Assuming there is sufficient evidence of such a group with the requisite intent, I am still troubled by the adequacy of the proof that the advocacy constituted "'a call to forcible action' for the accomplishment of immediate or future overthrow, in contrast to the teaching of a mere 'abstract doctrine' favoring that end." *Scales v. United States*, 367 U.S. 203, 231 (1961) (citing *Yates v. United States*, 354 U.S. 318, 329 (1957)).

*Insufficient Evidence of a Group*

There was no evidence, other than appellant's uncorroborated statement, that appellant was a member of a group which encouraged the overthrow or destruction of the Government by force or violence. In fact, there was no corroborated evidence of the actual existence of any such group, and certainly no evidence that any member of this group shared appellant's intent. The government chose not to provide testimony of any alleged members of the organization. Instead, the evidence was limited to PFC JL, who testified that after speaking with appellant about his political views, appellant invited him to join a group and serve as a lieutenant. Appellant told PFC JL that the group's mission was to help defend the Constitution against all enemies foreign and domestic and that "there should be someone to be able to defend the Constitution." Appellant told PFC JL he must purchase a uniform, but appellant would provide the patches. Private First Class JL testified appellant never used the word "militia" or indicated the aim of the group was to overthrow the Government. Private First Class JL did see a multicam uniform with a patch with a skull and a spade, as well as an umbrella patch at appellant's apartment. Private First Class JL also testified that while he went to the Outpost on several occasions and saw several other members of the unit there, he never saw appellant at the Outpost. Finally, PFC JL testified that activities at the Outpost included camp fires, drinking alcohol, and target shooting - not drilling and other actions associated with a group designed to overthrow the government. During cross examination, PFC JL further testified that one of the patches he saw at appellant's apartment depicted the *Resident Evil* umbrella insignia. In fact, appellant often spoke of a zombie invasion and how they should protect themselves during a zombie invasion and the discussion of zombies was fairly prevalent. Finally, PFC JL testified that he did not take the group seriously and thought it was a joke. He was never invited to a meeting of the group, never received any pamphlets or documents associated with the group, and never took an oath to the group.

Likewise, Mrs. KR's testimony did not corroborate the existence of the Dark Horse organization. Mrs. KR heard appellant mention the word militia and saw appellant appear to pass out patches to fellow soldiers. She also received the disturbing texts from appellant about the existence of the group. She did not,

however, testify that a group with the aim of overthrowing the Government existed. Instead, her testimony was limited to her communications and observations of appellant. She also testified that she and her husband, SPC JD, started going to the Outpost in 2008, almost two years before she met appellant. Her description of the Outpost mirrored that provided by PFC JL and painted a picture of camp fires, beer drinking, BBQs, and target shooting.

Finally, the testimony by the Secret Service agents only served to corroborate appellant's conduct and professed beliefs but did not corroborate the existence of a group. The photos that display soldiers conducting target practice at the Outpost match the portrayal of a recreational camping spot described by Mrs. KR and PFC JL. Even the photo of appellant wearing a multicam uniform with one of the aforementioned patches and holding a weapon only further corroborated appellant's personal behavior. Although the forensic examination of the computer revealed the presence of the documents in support of a militia, there was no evidence appellant shared the documents with anyone. Indeed, the documents themselves, while containing some incriminating assertions by appellant, also demonstrate appellant's vivid imagination and the merger of fantasy and reality. These documents purportedly reflect the mission of the "Top Secret group" that is part of the U.S. Army Special Forces known as "Dark Horse." Appellant refers to himself alternatively as "Sergeant Moyers," and "Dark Horse Commanding General Christopher Moyers." He also used the actual U.S. Army Special Forces regimental insignia and the Seal of the Department of Defense on the documents.

*Insufficient Evidence of Advocacy of Action*

Even if the group existed, any plan to overthrow the Government was conditional and insufficient to demonstrate "advocacy of action," that is required to meet the strict standards for the adequacy of proof. *Scales*, 367 U.S. at 232. In his confession, appellant stated the group would fight alongside the military, "if the government goes corrupt" and would act "if need be in the future." Appellant stated there were no specific plans, he provided no indication of teaching or training in support of the Dark Horse objectives, and no funding for the group. Instead, appellant likened the group's mission to a contingency. Appellant never traveled to any political rallies or events to conduct surveillance nor did he take any steps in furtherance of the aim of the alleged group. In fact, President Obama visited Fort Bliss in August 2012, and appellant did not attend the event, made no plans for the group to attend the event, and made only passing remarks about not being upset if someone shot the President or if Air Force One "blew up."

This is not to discount the government's initial assessment of the case when they were alerted as to appellant's conduct. The texts, the weapons, the Dark Horse documents, and the attempted recruitment of other soldiers, at first blush, create a troubling set of facts. However, upon a more detailed review of the circumstances, a

different picture emerges. Appellant was young, not particularly sophisticated, and did not have a high GT score. He also did not have a clearly articulated plan to overthrow the government, and did not have any resources for the group.[10] There was no evidence that appellant circulated the Dark Horse documents, swore soldiers to the oath, or took any steps to obtain funding for the organization. Appellant had trouble articulating even a basic understanding of how the government works. For example, when he tried to discuss his irritation with the government, he did not know the word "administration." When asked by the CID agent if he was angry with other leaders in government, for example, Nancy Pelosi, appellant answered "That name sounds familiar. Who is it?"

If we are to believe that appellant's beliefs were attributed to the Dark Horse members, it is clear the advocacy of action was, at best, sporadic because the instances were "infrequent" and "casual." *Scales*, 367 U.S. at 253-54. In fact, the only corroborated evidence of a "call to action" occurred when appellant sent the text messages to Mrs. KR, who was not a member of the group. Rather than a depiction of "present advocacy," required by the statute, these text messages represent nothing more than bravado and bluster of a junior soldier who was dissatisfied with the government.

Finally, it is important to note that 18 U.S.C. § 2385 is a twenty-year offense that should be reserved for individuals who engage in treason or subversive acts that threaten the government. The evidence in this case demonstrated that while appellant was naïve and intemperate, he did not display behavior that gave rise to a credible threat. The Dark Horse documents are filled with fantastical elements mixed in with youthful rantings. The government failed to corroborate key portions of appellant's statement, and failed to produce one member of the alleged Dark Horse militia to testify to the group's purpose and teachings. Appellant's conduct was certainly ill-advised, but simply did not rise to the level that warrants the severity of this charge.

*Conclusion*

While the evidence was not sufficient to demonstrate appellant belonged to a group which encouraged the overthrow or destruction of the Government of the United States by force or violence in violation of 18 U.S.C. § 2685, appellant's confession was sufficiently corroborated to show appellant advised, counseled, and urged disloyalty and mutiny by members of the military forces of the United States. Testimony by Mrs. KR revealed appellant approached other soldiers with the idea of a militia and distributed patches. Private First Class JL corroborated that appellant

---

[10] Although appellant discussed in his confession that the wife of one of the soldiers would serve as the accountant for Dark Horse, there is no evidence that anyone ever raised any funds or opened an account on behalf of Dark Horse.

attempted to recruit him and offered him the position of lieutenant in his group. This evidence, combined with the computer and physical evidence seized by the Secret Service, along with appellant's confession, is legally and factually sufficient to prove appellant violated of 18 U.S.C. § 2387. Furthermore, 18 U.S.C § 2387 does not require a group with a shared intent, unlike 18 U.S.C. § 2385. Therefore, while I would affirm Specification 3 of Charge V, I would set aside the finding of guilty of Specification 2 of Charge V in addition to setting aside appellant's conviction under Article 92, UCMJ.

This relief results in a dramatic change in the penalty landscape, reducing the maximum punishment from thirty-two years to ten years. The remaining offense does not capture the gravamen of the criminal conduct included with the original offenses, and furthermore, this court does not have significant experience with the single, surviving charge. *See United States v. Winckelmann*, 73 M.J. 11, 15-16 (C.A.A.F. 2013). I conclude the best course of action in this case would be to order a sentence rehearing, as I am not convinced this court could reliably determine what sentence the military judge would have imposed on the last remaining offense. *See, e.g. United States v. Buber*, 62 M.J. 476, 480 (C.A.A.F. 2006).

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

15